**Susan ROSENBERG, Plaintiff,**

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and John Wyllys, Defendants.**

No. Civ.A. 96–12267–NG.

United States District Court, D. Massachusetts.

Jan. 26, 1998.

Steven T. Sager, Marc Redlich, Law Offices of Marc Redlich, Boston, MA, Richard P. Goodkin, Framingham, MA, for Susan M. Rosenberg.

Barry Y. Weiner, Christopher P. Litterio, Shapiro, Israel & Weiner, P.C., Boston, MA, Marifrances Dant Bolger, Morgan, Lewis & Bockius, Washington, DC, Joseph J. Costello, Mark S. Dichter, Morgan, Lewis & Bockius,

Philadelphia, PA, for Merrill Lynch Pierce Fenner & Smith, Inc. and John Wyllys.

Robert J. Gregory, Washington, DC, for E.E.O.C.

Robert S. Mantell, Law Offices of Kevin G. Powers, Boston, MS, for Masschusetts Branch of National Employment Lawyers Ass'n.

Ozell Hudson, Jr., Lawyers' Committee for Civil Rights, Boston, MS, for Lawyer's Committee for Civil Rights.

Sydelle Pittas, Law Office of Sydelle Pittas, Winchester, MA, for Women's Bar Ass'n.

Sally Dunaway, Washington, DC, for American Ass'n of Retired Persons.

Jody E. Forchheimer, Bingham, Dana & Gould, Boston, MS, for Securities Industry Ass'n.

Loretta M. Smith, Boston, MA, for Associated Industries of Massachusetts.

Richard L. Alfred, Hill & Barlow, Boston, MA, for Boston area Management Attorney's Group.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* .................................................... 191

II. *BACKGROUND* ................................................. 193

III. *DISCUSSION* ................................................... 194
    A. *The Case Law From Alexander v. Gardner-Denver To Gilmer* ............. 194
        1. *The rule against mandatory arbitration of statutory claims* ........... 194
        2. *The shift to a presumption in favor of arbitrability* .................. 195
        3. *The perceived inapplicability or Mitsubishi to civil rights claims* ..... 196
            a. *The inappropriateness of free market presumptions in the employment discrimination setting* ........................... 196
            b. *The public functions of civil rights litigation* ................... 197
        4. *Gilmer v. Interstate/Johnson Lane* ............................... 199
    B. *The Arbitrability of Title VII claims* .............................. 200
        1. *The Role of Federal Courts in the Title VII Scheme* .................. 200
        2. *The Civil Rights Act of 1991* ...................................... 200
            a. *The Express Preclusion of Mandatory, Pre-Dispute Arbitration Agreements* .......................................... 201
            b. *The Structure and Purpose of the 1991 Act* ...................... 204
            c. *The creation of a right to a jury trial* ......................... 205
    C. *The Adequacy of the NYSE Forum to vindicate Rosenberg's ADEA claim* ......................................................... 206
        1. *Norms and Standards of Arbitral Impartiality* ....................... 207
        2. *Application of Norms of Arbitral Impartiality to the NYSE System* ..... 210

IV. *CONCLUSION* ................................................ 212

### I. INTRODUCTION

This case involves the complex interaction between the important goal of eliminating workplace discrimination on the one hand, and the national commitment to enforcing arbitration agreements on the other.

Plaintiff Susan Rosenberg ("Rosenberg") brought suit against her former employer, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and her former supervisor, John Wyllys ("Wyllys") (collectively "defendants"), alleging age and gender discrimination, as well as sexual harassment.[1] Defen-

---

**1.** Plaintiff sued in Superior Court in Suffolk County, Massachusetts, from which defendants removed this case. Plaintiff has not moved for remand. In her complaint, Rosenberg does not explicitly base her claims on federal law. Defen-

dants contend that her claims arise out of 29 U.S.C. § 621 *et seq.* and 42 U.S.C. § 2000e *et seq.,* otherwise known as the ADEA and Title VII respectively. Rosenberg has not challenged these contentions.

dants have moved to compel arbitration and to stay these proceedings pending its outcome. They allege that when Rosenberg filled out a securities industry registration Form U–4, a prerequisite to working as a securities broker, she agreed to arbitrate "any dispute, claim or controversy" that might arise between herself and her employer. *Gilmer v. Interstate/Johnson Lane Corp.*[2] and the Federal Arbitration Act[3] ("FAA"), defendants assert, require enforcing that agreement and denying Rosenberg access to this judicial forum and to a trial by jury.

On April 23, 1997, I partially deferred the defendants' motion in order to allow the parties to explore more fully several important issues raised by the pleadings. While the *Gilmer* Court had enforced the U–4 arbitration clause in a case brought under the Age Discrimination in Employment Act ("ADEA"), its decision had not addressed the arbitrability of claims brought under Title VII. It also left two factual issues for "decision in specific cases": whether a particular arbitral forum was adequate to vindicate the statutory rights involved; and whether the agreement to arbitrate was involuntary or unconscionable. As I explained:

> The issue before me is the application of *Gilmer* to the facts at bar. *Gilmer* raises two questions, one more general, one more specific. The general question is: Whether Rosenberg may be obliged as a condition of her employment to prospectively waive the right to litigate the Title VII claim in a federal forum, before an Article III judge and jury. That question involves two others: (a) Do the conclusions of *Gil-*

*mer* with respect to the ADEA apply as well to Title VII, as amended by the Civil Rights Act of 1991? and, (b) Do the conclusions of *Gilmer* with respect to the adequacy of the arbitral fora—that the arbitrators in the securities industry are unbiased, competent and effective to enforce federal civil rights claims—apply to the instant case?

> The more specific question is: Assuming Title VII permits a prospective waiver of the right to a federal forum, does Rosenberg's waiver meet the legal standards? This question also has several sub-parts: (a) What are the standards governing the waiver of this statutory and perhaps, constitutional right to a jury trial? (b) Whether the circumstances surrounding Rosenberg's waiver in fact complied with those standards, i.e., was it knowingly and voluntarily made; and, (c) Whether her agreement to arbitrate was revocable, due to the employer's unequal bargaining power or any other "adhesion" arguments.... I conclude that the record in the instant case is presently inadequate on a number of levels for current resolution....

*Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (Rosenberg I )*, 965 F.Supp. 190, 192 (D.Mass.1997). I ordered additional briefing and discovery on these issues, and requested *amicus* participation. The parties[4] and numerous *amici*[5] responded with submissions exploring these and many other issues.

After consideration of all the written materials and the oral arguments of counsel, I

---

**2.** 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

**3.** 9 U.S.C. § 1 *et seq.*

**4.** Defendants' initial response was to seek my recusal on the grounds that six years ago, as a private attorney, I had represented a woman in a sex discrimination suit against Merrill Lynch arising out of events that occurred at a different Merrill Lynch office in the years immediately preceding 1984. Although the timing of the defendants' motion was troubling, I gave it serious consideration. On September 3, 1997, I denied it. *See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 976 F.Supp. 84 (D.Mass.1997).

**5.** *Amicus* briefs on behalf of the plaintiff were submitted by: The United States Equal Employ-

ment Commission ("EEOC"); The American Association of Retired Persons; The American Jewish Congress; The Lawyers Committee for Civil Rights Under Law of the Boston Bar Association; the Massachusetts Branch of the National Employment Lawyers Association; the Women's Bar Association (of Massachusetts) and the National Association of Women Lawyers; and collectively by the National Employment Lawyers Association, NOW Legal Defense and Education Fund, National Women's Law Center, and Women's Legal Defense Fund. The Boston Area Management Attorneys Group, the Securities Industry Association, and Associated Industries of Massachusetts submitted briefs on behalf of the defendants.

have concluded that defendants' motion to compel arbitration must be **DENIED.**

## II. *BACKGROUND*

Rosenberg was forty-five years old when she was hired by Merrill Lynch on January 6, 1992 for employment in its Wellesley, Massachusetts office. She held a bachelor of science degree and had worked in product engineering; she had no experience in the securities industry. She began in a training program for financial consultants known as the Professional Development Program; this program normally lasts 24 months. On January 10, 1992, Rosenberg filled out a U–4 Form, which is the Uniform Application For Securities Industry Registration Or Transfer. It appears from internal Merrill Lynch records that the U–4 was initially submitted with her supervisor's signature alone, and then returned to Rosenberg ·for her signature two weeks after she started work.

As its name implies, the U–4 is a uniform, standardized form. It must be completed by anyone seeking to work as a broker in the securities industry, for any employer, anywhere in the country. The U–4 form requires all prospective securities brokers to:

> ... agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in *item 10* as may be amended from time to time and that any arbitration · award rendered against me may be entered as a judgment in any court of competent jurisdiction. (emphasis added.)

Item 10 lists the various organizations, such as the New York Stock Exchange ("NYSE") and National Association of Securities Dealers, Inc. ("NASD"), as well as the fifty states, in which one can become licensed to trade securities. The NYSE and NASD are self-regulating organizations ("SROs"), made up of securities firms and charged by statute with regulating the practices of their industry. Merrill Lynch is a member of the American Stock Exchange ("ASE"), the NASD, and the NYSE. A mark in the boxes on the · U–4 form expresses an employee's intent to apply to be registered and licensed with the organizations indicated.

Five of the boxes in item 10 on Rosenberg's U–4 form are marked with an X: the boxes labeled ASE, CBOE, NASD, NYSE, and Massachusetts.[6] Rosenberg, however, neither remembers checking the boxes herself nor authorizing anyone to check them for her. She adds that as a newcomer to the industry, she would have had no idea which of these boxes to check. In fact, the boxes may already have been checked before Rosenberg was given the form to complete. As explained in an affidavit by Marie Montagnino, Manager of the Registration Department at Merrill Lynch, "[s]ince all of Merrill Lynch's domestic registered representatives are required to register with the ASE, the NASD, and the NYSE, the "x" marks next to those SROs are ... pre-printed."

On the copies of Rosenberg's U–4 that Merrill Lynch has submitted in this case, the boxes for ASE, NYSE, and NASD appear to have been checked by hand by January 10, 1992, when the form was completed but signed only by Wyllys. When the form was returned to Rosenberg for her signature on January 24, two weeks after she began work, it was pre-dated to January 10, and two additional boxes, the "CBOE" and "MA" boxes, were also checked. It is not at all clear from the records who made these additional marks or when.

In addition to having no memory of marking the boxes, Rosenberg has no memory of signing the document at all, although she recognizes her signature. She admits that presented with a· stack of papers when she started work, she did not read much of what she was required to sign. She assumed the papers were similar to those she had been presented with at every other new job she had started. No one pointed out to her that she was in fact agreeing to arbitrate all future disputes with her employer, including discrimination claims, should they arise. Nor was she given any information that

---

**6.** The parties have not addressed the relevance of the ASE, CBOE, or Massachusetts boxes to this dispute.

would have given content to the open-ended commitment to arbitrate disputes "required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in *item 10* as may be amended from time to time." She asserts that she never received a copy of the rules from the Securities Exchange Commission ("SEC"), NASD, or NYSE, or any other organization, much less any amendments to these rules. She claims that had she been aware of the U–4's import, she would have discussed the need for the agreement with her employer and sought outside advice before signing.

On May 5, 1992, Rosenberg became a Financial Consultant at Merrill Lynch. She alleges that almost two years later, on March 9, 1994, she was harassed by her supervisor John Wyllys. Wyllys, she claims, handed her a phallus-shaped vibrator when she came into his office looking for a document. She contends she did not speak to him again until April 25, 1994, when she met with him to discuss her performance as a financial consultant. He indicated that her performance was not up to the expected levels and suggested she resign. The next day, Rosenberg called Wyllys to invite him to meet her for dinner to discuss his evaluation. On April 27, he accepted; at the dinner, Rosenberg told Wyllys she would not resign. She was terminated effective May 2, 1994, for inadequate performance, i.e. lack of production.

According to Rosenberg, she was the only consultant in the Wellesley office who was over forty, among the consultants with a comparable length of service ("LOS") (two years). She claims she outperformed at least four male consultants in her two-year LOS group, but that she was the only one to be terminated in the several months before and after May 2, 1994. She alleges that her termination was the result of age and gender discrimination. In addition, she claims sexual harassment based on her March 1994 encounter with Wyllys.

---

**7.** *See, e.g., Patterson v. Tenet Healthcare, Inc.,* 113 F.3d 832, 837 (8th Cir.1997), *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363–364 (7th Cir. 1997); *Brisentine v. Stone & Webster Eng'g. Corp.,* 117 F.3d 519, 524–25 (11th Cir.1997); *Cole v. Burns Int'l. Sec. Servs.,* 105 F.3d 1465, 1478 (D.C.Cir.1997); *Zarzycki v. Hamilton Stan-*

## III. DISCUSSION

### A. The Case Law From Alexander v. Gardner–Denver To Gilmer

#### 1. The rule against mandatory arbitration of statutory claims.

For almost twenty years, it was beyond question that employees who were the victims of workplace discrimination were entitled to litigate before a court, regardless of any pre-dispute agreement to arbitrate. In *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court held that a union member could bring a Title VII suit in court, even though his discharge had already been arbitrated under a collective bargaining agreement. Although the *Gilmer* Court and subsequent lower courts have emphasized *Gardner–Denver*'s doubts about the vindication of civil rights through *labor* arbitration,[7] the opinion was long understood to have a much wider application.

For several decades, the decision was cited for the rule that no agreement to arbitrate could prevent a civil rights plaintiff from bringing suit in federal court. *See, e.g. Swenson v. Management Recruiters Int'l., Inc.,* 858 F.2d 1304, 1308–1309 (8th Cir.1988), *cert. denied,* 493 U.S. 848, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989) ("*Alexander* makes clear that Congress intended the right in employment discrimination cases to have access to judicial remedies to outbalance the federal policy favoring arbitration."); *Nicholson v. CPC Int'l., Inc.,* 877 F.2d 221, 229 (3rd Cir. 1989); *Rosenfeld v. Dep't of Army,* 769 F.2d 237, 239 (4th Cir.1985) ("The plain lesson of *Alexander v. Gardner–Denver Co.* ... is that Congress entrusted the ultimate resolution of questions of discrimination to the federal judiciary."); *Lyght v. Ford Motor Co.,* 643 F.2d 435, 439 (6th Cir.1981); *Holley v. Seminole County Sch. Dist.,* 755 F.2d 1492, 1503 (11th Cir.1985), *reh'g denied,* 763 F.2d 399 (11th Cir.1985).

---

*dard,* 1997 WL 380434 at *3 (D.Conn.); *Battle v. Prudential Ins. Co. of Am.,* 973 F.Supp. 861 (D.Minn.1997); *Lynch v. Pathmark Supermarkets,* 1997 WL 598456 at *5 (S.D.N.Y.); *Claps v. Moliterno Stone Sales, Inc.,* 819 F.Supp. 141, 146–47 (D.Conn.1993).

This broad interpretation of *Gardner–Denver* found support in the opinion itself. The decision began with an analysis of the Title VII enforcement scheme and its significance. The Congress had considered the eradication of discrimination to be of the "highest priority," and had sought to encourage enforcement by creating "parallel or overlapping remedies against discrimination." *Gardner–Denver*, 415 U.S. at 47. In this multiforum scheme, federal courts were charged with the "final" enforcement authority, an authority that was not impaired by any number of other authorized means for vindicating civil rights, including voluntary settlement, other state and federal laws, EEOC conciliation efforts, and labor arbitration. *Id.* at 44. The guarantee of access to federal courts for Title VII plaintiffs could not be broader or more clear: "The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal." *Id.* at 56.

In contrast, labor arbitration had a much more limited focus, the Court noted. It was primarily designed to interpret and enforce collective bargaining agreements, which, because they did not encompass public law claims, did not authorize arbitrators to decide them. Arbitrators, moreover, lacked the necessary expertise or fact-finding capabilities for resolving public law claims. *Id.* at 52–53.

Thus, while *Gardner–Denver* was primarily based on an analysis of the structure and purpose of Title VII, it also drew on existing judicial doctrine that arbitration was inherently inadequate for enforcing public law, statutory rights. *See Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953),

overruled by *Rodriguez de Quijas v. Shearson/American Express, Inc.* ("*Rodriguez*"), 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). This portion of Gardner–Denver has since been questioned.

### 2. The shift to a presumption in favor of arbitrability

In a trilogy of cases in the mid–1980s, the Supreme Court reversed its long-standing presumption against the enforcement of pre-dispute agreements to arbitrate statutory claims. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Shearson/American Express Inc. v. McMahon* ("*McMahon*"), 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Mitsubishi Motors v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (collectively "the *Mitsubishi* trilogy"). The Court now recognized the controlling weight of the "strong federal policy" in favor of arbitration, dating back to the passage of the Federal Arbitration Act sixty years before. The subsequent decades of decisions refusing to apply the FAA to statutory claims, the Court reflected, were the product of an outmoded "judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals...." *Mitsubishi*, 473 U.S. at 626–27.

In the future, the FAA would be presumed to apply to all agreements to arbitrate, unless Congress had provided otherwise with respect to particular statutory claims. In order to defeat a motion to compel arbitration of a statutory claim, a plaintiff who had signed a pre-dispute agreement to arbitrate would have to demonstrate one of three things: that Congress had expressed an intent to preclude compulsory arbitration, either in the statute's text or its legislative history; [8] that there was an inherent conflict

8. Of course, there is somewhat of a Catch–22 here: it was not until the Supreme Court announced in the *Mitsubishi* trilogy that a plaintiff had to prove a Congressional intent to preclude compulsory arbitration that Congress could have known that any such expression of intent was required. From the mid–'50s to the mid–'80s, at least, Congress had no reason to doubt the continuing force of the judicial doctrine that statutory claims could not be subjected to compulsory arbitration. "The nub of the problem," as one commentator put it, "is that all of the federal laws in question were enacted at a time when the

FAA was thought not to reach federal statutory claims." Samuel Estreicher, *Arbitration of Employment Disputes Without Unions*, 66 Chic.–Kent L.Rev. 753, 789 (1990). As discussed below, the Civil Rights Act of 1991 was enacted in a moment of transition. Drafted and reported out of committee while civil rights statutes were still presumed not to be subject to pre-dispute arbitration agreements, it was passed just a few months after *Gilmer* had applied *Mitsubishi*'s reasoning to the ADEA. Congress was thus aware that some statutory claims could be subject to

between compulsory arbitration and the statute's purpose; or that the arbitral forum was inadequate to vindicate the plaintiff's rights effectively. If the plaintiff could show none of these things, the only defense to a motion to compel arbitration would be the one provided for in the FAA itself: "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

In *Mitsubishi*, the Court analyzed the text, history, and purpose of the Sherman Act, as well as the adequacy of the Japanese arbitral forum involved, and held that arbitration should be compelled. In the next several years, it applied the *Mitsubishi* test to three other business-related statutory claims, and compelled arbitration of all three. *See McMahon*, 482 U.S. at 238, 242 (Exchange Act § 10(b) and RICO claims); *Rodriguez*, 490 U.S. at 480–81 (claims under § 12(2) of the Securities Act of 1933).

### 3. The Perceived inapplicability of Mitsubishi to civil rights claims.

*Mitsubishi*, *McMahon*, and *Rodriguez* shared a strong rejection of the traditional judicial suspicion of arbitration. Nonetheless, the decision to compel arbitration in each case was made only after a careful analysis of the relevant statute's language and purpose.

Significantly, the *Mitsubishi* trilogy had dealt with "arbitration agreements in the setting of business transactions," *Rodriguez*, 490 U.S. at 484. Prior to *Gilmer*, many courts and commentators, including the First Circuit, *see Utley v. Goldman Sachs & Co.*, 883 F.2d 184, 186–87 (1st Cir.1989) *cert. denied* 493 U.S. 1045, 110 S.Ct. 842, 107 L.Ed.2d 836 (1990), believed that if a similar analysis were to be applied to civil rights statutes, the result would be different. *See, e.g., Alford v. Dean Witter Reynolds, Inc.*, 905 F.2d 104, 107 (5th Cir.1990); *vacated and remanded*, 500 U.S. 930, 111 S.Ct. 2050, 114 L.Ed.2d 456 (1991), *rev'd* 939 F.2d 229 (5th Cir.1991); *Nicholson v. CPC Int'l, Inc.*, 877 F.2d 221 (3rd Cir.1989); *Swenson v. Management Recruiters Int'l, Inc.*, 858 F.2d 1304, 1306 (8th Cir.1988); *Borenstein v. Tucker*, 757 F.Supp. 3, 5 (D.Conn.1991); G. Richard Shell, *ERISA and Other Federal Employment Statutes: When is Commercial Arbitration an "Adequate Substitute" for the Courts?*, 68 Tex.L.Rev. 509, 568–69 (1990). In several respects, critical to the question of mandatory arbitration, the civil rights context was completely different from the commercial setting.

#### a. The inappropriateness of free market presumptions in the employment discrimination setting.

*Mitsubishi*, *McMahon*, and *Rodriguez* shared a presumption that the plaintiffs had freely entered into the agreement to arbitrate. The *Mitsubishi* Court believed that "[n]othing … prevents a party from excluding statutory claims from the scope of an agreement to arbitrate." *Mitsubishi*, 473 U.S. at 628, 631. It likened the arbitration provision in that contract to *"freely negotiated* choice-of forum clauses." *Id.* (emphasis added). As the Court explained in another FAA case that year, "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which the parties had entered…." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). "Having made the bargain to arbitrate, the party should be held to it…." *Mitsubishi*, 473 U.S. at 628. *See also, Rodriguez*, 490 U.S. at 483–484 (noting that the Securities Exchange Act intended to give buyers of securities—such as the plaintiffs—"a broader right to select the forum for resolving disputes, whether it be judicial or otherwise," and that "[a]lthough petitioners suggest that the agreement to arbitrate here was adhesive in nature, the record contains no factual showing sufficient to support that suggestion"); *McMahon*, 482 U.S. at 230 (rejecting the argument that certain provisions of the Securities Exchange Act reflected concerns for buyers' inherently unequal bargaining power and frequent "broker overreaching").

Civil rights statutes, however, protect vulnerable plaintiffs who should not be presumed to have freely made the bargain to

mandatory arbitration agreements, but it reaffirmed that Title VII claims were not among them.

arbitrate. Individual employees can rarely be said to have bargained for the conditions of their employment; this is the very premise on which our collective bargaining laws and a host of statutory labor protective schemes rests. *See Barrentine v. Arkansas–Best Freight Sys.*, 450 U.S. 728, 735, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981) (labor laws are "[p]redicated on the assumption that individual workers have little, if any, bargaining power"). When the employees in question are members of traditionally disadvantaged groups—women or minorities—the *Mitsubishi* trilogy's freedom of contract presumptions are especially troubling. Discrimination laws reflect the Congressional finding that these groups are especially in need of federal protection in the workplace. *See Pryner*, 109 F.3d at 360. A few years after passing Title VII, Congress amended it to reflect the reality that:

the nature of Title VII actions more often than not pits parties of unequal strength and resources against each other. The complainant, who is usually a member of a disadvantaged class, is opposed by an employer who not infrequently is one of the nation's major producers.... H.R.Rep. No. 238, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.C.C.A.N. 2137, 2148.

As I noted in my April order in this case:

Bias against individuals, particularly on account of race or gender, arguably suffused the bargaining process and cast significant doubt on whether there had been meaningful negotiation, not to mention meaningful waivers of the right to an Article III judge and a representative jury. Such waivers could well be suspect for all the very reasons that made statutes guarding the rights of protected groups necessary in the first instance. *Rosenberg I*, 965 F.Supp. at 195.

In such a context, *Mitsubishi's* equation of mandatory arbitration clauses with commercial contracts' "freely negotiated choice-of-forum clauses" would seem misplaced.

### b. *The public functions of civil rights litigation.*

Litigation of discrimination claims also serves public functions that arbitration cannot replicate. Employment discrimination is complex, invidious, and often disguised. As Congress remarked, reflecting on the first six years of Title VII:

The forms and incidents of discrimination ... are increasingly complex. Particularly to the untrained observer, their discriminatory nature may not appear obvious at first glance. H.R.Rep. No. 238, 1972 U.S.C.C.A.N. at 2144.

Litigation brings such discrimination to light, disclosing "incidents or practices ... [which reveal] patterns of noncompliance ... which can be of industry-wide significance." *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 358–59, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

By revealing these patterns and naming them as unlawful, litigation helps articulate norms of non-discriminatory conduct and publicize them to both those regulated and those protected by anti-discrimination laws. It has played and continues to play a crucial role in the legal and social changes that have opened new opportunities to millions of Americans and transformed standards of behavior in all of our workplaces. *See* H.R.Rep. 40(I), 102d Cong., 1st Sess. 25 & n. 7 (1991), *reprinted in* 1991 U.S.C.C.A.N. 549, 563 (describing the nationwide impact of a single Supreme Court case). From the creation of a disparate impact claim under Title VII, *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) to the recognition of sexual harassment as a civil rights violation, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), to conflicting definitions of what may justify an apparently facially discriminatory action, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), *Griggs*, 401 U.S. at 432, the courts have helped shape the public discussion about the nature and content of our civil rights. *See* Harry T. Edwards, "Alternative Dispute Resolution: Panacea or Anathema," 99 Harv.L.Rev. 668, 679 (1986) ("Imagine, for example, the impoverished nature of civil rights law that would have resulted had all race discrimination cases in the sixties and seventies been mediated rather than adjudicated.")

When discrimination cases are resolved outside of the public forum of the courts, fewer voices join in this discussion. It is not

that arbitrators will be unable to recognize and correct complex systems of discrimination, or to achieve a just resolution of individual cases. Indeed, the case law is long past the days in which judges routinely assumed that arbitrators were unable to understand and resolve complex factual and legal problems. Still, arbitration is dedicated to the resolution of individual, private disputes, not the binding articulation of public norms. It is a system that has traditionally made decisions in private. *See* American Arbitration Association, *National Rules for Resolution of Employment Disputes Arbitration and Mediation Rules,* Rule 16 (1996), *reprinted in* 1996 D.L.R. 102 d30 (May 28, 1996) ("AAA *Rules*") (providing that "[t]he arbitrator shall maintain the confidentiality of the hearings...."); *Mandatory Arbitration of Statutory Employment Disputes,* 109 Harv.L.Rev. 1670, 1673 (1996) (listing "increased confidentiality" as a benefit of arbitration of employment disputes).

The Securities Industry Conference on Arbitration (SICA) *Arbitrators Manual,* for example, states that "[u]nder present law, an arbitrator is not required to give a reason for the decision." SICA, *Arbitrators Manual,* 31 (1996). This is reflected in securities industry rules.[9] In NASD training sessions, arbitrators are taught that "awards that do not contain the panel's reasons are more appropriate...." Written opinions, they are told, are burdensome, time-consuming, and invitations to judicial review—not to mention that arbitrators may not even be competent to write them properly. Terry R. Weiss, *If We Wanted Your Opinion, We Would Have Asked For It: Why Arbitrators Need Not State the Reasons for Their Award,* Presented for NASD Arbitration Training (May 18, 1994). The proceedings themselves are confidential. SICA, *Arbitrators Manual,* at 34; Deposition of NYSE Senior Vice President and Secretary, NYSE, James Buck at 66.[10]

Arbitrators are "not strictly bound by case precedent or statutory law." SICA, *Arbitrator's Manual,* at 27–28. According to the deposition of the NASD Director of Arbitration, Deborah Masucci [hereinafter "Masucci Dep."], their training reflects this approach, without regard to whether the subject of the arbitration is a Title VII or other civil rights claim. Masucci Dep. at 42.

Nor is the arbitrator's discretion checked by any meaningful judicial review. *See* FAA, 9 U.S.C. § 10; American Arbitration Association, *Guide for Employment Arbitrators,* *reprinted in* Peter M. Panken, et al., *Avoiding Employment Litigation: Alternative Dispute Resolution of Employment Disputes in the '90s,* SB31 ALI–ABA 69, 115, 116 (1996) (instructing arbitrators that it "has long been a settled principle of arbitration

---

**9.** The NYSE Rules provide only that:

> The award shall contain the names of the parties, the name(s) of counsel, if any, a summary of the issues ..., the damages and or other relief requested, the damages and or other relief awarded, a statement of any other issues resolved, the names of the arbitrators, the date the claim was filed and the award rendered, the number and dates of hearing sessions, the location of the hearing, and the signatures of the arbitrators concurring in the award. NYSE Department of Arbitration, Article XI, Arbitration Rules 23, Rule 627(e)(1995) ("NYSE Rules")

The parties have submitted some examples of how this rule is applied in practice. Although some awards are accompanied by lengthy and thoughtful decisions, many others contain no reasoning whatsoever. Thus, in the case of *Martha Zepeda v. C.S. First Boston Corp.,* the claim summary stated that the claimant "alleges that she was subjected to a sexually hostile work environment and was terminated for complaining of same. Claimant further alleges false imprisonment, slander per se and violations of Title

VII...." The Decision consisted of five lines setting out the amounts of damages, fees, and interest awarded to the claimant and the forum fees assessed against the defendant, and ordering a change in her U–5 form. It concluded "[a]ll other relief not expressly granted herein is denied." *Martha Zepeda v.C.S. First Boston Corp.,* NYSE Arb. (1997) (Lane, Murphy & Schaedtler, Arbs.) Other cases are even more mysterious In *Dianna Dair Meyer v. Shearson Lehman Bothers, Inc.,* decided in 1994, the NYSE panel reported that "claimant alleges discrimination in employment based on sex, age and retaliation" and the resolution of the case was a perfunctory "Claim is dismissed." *Dianna Dair Meyer v. Shearson Lehman Brothers, Inc.,* NYSE Arb. (1994) (Bushnell, Hatton & Pender Arbs.)

**10.** This deposition and that of Deborah Masucci of the NASD were taken in the case of *Duffield v. Robertson Stephens & Co.,* Case No. C–95–0109–EFL (N.D.Cal. filed January 11, 1995). They were submitted by the National Employment Lawyers Association in support of their *amicus* brief, with an accompanying affidavit by the plaintiff's attorney Cliff Paletsky.

law" that "courts will … not review awards … on their merits"). Discrimination cases should not be entrusted to arbitration, commentators urged, without a new, higher standard of review to ensure that civil rights were being consistently and fairly vindicated. *See* Edwards, *Alternative Dispute Resolution,* 99 Harv.L.Rev. at 680, 684.

### 4. Gilmer v. Interstate/Johnson Lane

In 1991, however, the Supreme Court announced that victims of discrimination could be compelled to arbitrate their claims. In *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), it affirmed the reversal of a district court decision that, applying *Gardner–Denver,* had refused to compel arbitration of an ADEA claim. The established understanding of *Gardner–Denver,* the Court explained, had been too broad. *Id.* 500 U.S. at 35.

The plaintiff in *Gilmer* had worked as a financial services manager, and like Rosenberg, had been required to sign a U–4 as a condition of employment. At age 62, he was fired. Believing that he had been discharged because of his age in violation of the ADEA, Gilmer filed a charge with the EEOC and then brought suit in federal court. His employer responded by filing a motion to compel arbitration, arguing that the FAA required enforcement of the U–4's mandatory, pre-dispute arbitration clause. *Id.* at 23–24.

The Supreme Court subjected the ADEA to the *Mitsubishi* trilogy analysis: the "federal policy favoring arbitration" required compelling arbitration unless the plaintiff could show a Congressional intent to preclude compulsory arbitration of ADEA cases, demonstrate the inadequacy of the arbitral forum, or meet the FAA's common law test for revocation. Congressional intent to preclude arbitration could be found in any one of three sources: "the text of the ADEA, its legislative history, or an 'inherent conflict' between arbitration and the ADEA's underlying purposes." *Id.* at 26.

The plaintiff conceded that neither the ADEA's text nor its legislative history "explicitly precludes arbitration." [11] *Id.* He then presented a series of generalized arguments against the arbitration of statutory claims— including that compulsory arbitration would undermine important social policies, interfere with the EEOC's enforcement role, and deprive plaintiffs of access to the judicial forum provided for by the ADEA. All of these arguments, the Supreme Court noted, had been raised and rejected in *Mitsubishi, McMahon,* and *Rodriguez. Gilmer,* 500 U.S. at 27–30.[12]

---

**11.** This was an unlikely prospect in any event since the ADEA was passed in 1964, during a judicial regime that refused to enforce pre-dispute agreements to arbitrate statutory claims. *See, supra,* note 8.

**12.** Developments since *Gilmer* may have overtaken some of its premises. The Court rejected the plaintiff's concern that arbitration agreements would stifle the development of the law and limit public knowledge of discriminatory practices, believing that "judicial decisions addressing ADEA claims will continue to be issued because it is unlikely that all or even most ADEA claimants will be subject to arbitration agreements." *Id.* 500 U.S. at 32.

Evidence offered to this Court has raised serious doubts about this proposition. The U–4 is a condition of employment for specific categories of professional employees within the securities and insurance industries. Any applicant who either failed to sign it or attempted to negotiate or modify the arbitration clause would be ineligible for employment. Buck Dep. at 64; Masucci Dep. at 80. Thus, until the law or the industry policy changes, there will be little further judicial development of age discrimination precedent within this significant national industry.

Since *Gilmer,* moreover, many other industries have begun to impose pre-dispute arbitration agreements as a condition of employment. A recent General Accounting Office survey found that an estimated 8.4% of employers were considering implementing mandatory arbitration policies—a significant jump from the 1.3% that had already had such policies in place. Richard A. Bales, *Compulsory Arbitration: The Grand Experiment in Employment* 2 (1997). *See also* EEOC Notice, No. 915.002 (July 10, 1997) (noting that "the use of [mandatory arbitration] agreements is not limited to particular industries, but can be found in various sectors of the workforce, including … retail, restaurant and hotel chains, health care, broadcasting, a and security services."); Commission on the Future of Worker–Management Relations, *Report and Recommendations,* 239 (1994). As of the summer of 1996, the American Arbitration Association alone was helping administer the ADR programs of almost 300 large corporations, covering 3.5 million employees. *ADR News: 500 Attend Superconference in Washington,* 52–SUM Disp. Resol. J. 4, 5 (Summer 1997).

The plaintiff's attacks on the adequacy of the NYSE arbitral forum were rejected as "generalized" and "speculat[ive]." *Id.* at 30. Finally, his argument that the agreement was the result of unfair bargaining power was found to be equally unsupported by specific evidence. Nonetheless, the Court reiterated that there was room for raising these issues in future cases. "As with the claimed procedural inadequacies [of the NYSE system] ..., this claim of unequal bargaining power is best left for resolution in specific cases." *Id.* at 33.

The defendants argue that *Gilmer* controls the outcome of this case, and that I must compel arbitration. I disagree. As I explained in my April order, *Gilmer* addressed only the arbitrability of ADEA, not Title VII, claims. Gilmer did not raise and the Supreme Court did not resolve whether Title VII's text, history, or purpose should bar compulsory arbitration. Shortly after *Gilmer* was decided, moreover, Congress amended Title VII in numerous ways that are potentially relevant to that analysis. Finally, where Gilmer advanced only abstract and general arguments concerning the inadequacy of the NYSE forum and the unconscionability of the U–4 arbitration clause, Rosenberg has offered detailed and specific evidence concerning both claims. I will address each of these issues in turn.

### B. *The Arbitrability of Title VII claims*
#### 1. *The Role of Federal Courts in the Title VII Scheme*

■ From its inception, Title VII has looked to federal courts for enforcement. *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) ("the federal courts were entrusted with ultimate enforcement responsibility" under Title VII); *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 64, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980)(same). In *Gardner–Denver,* the Supreme Court held that it would be inconsistent with the Title VII scheme to allow arbitration to displace judicial enforce-

ment. *Gardner–Denver,* 415 U.S. at 56. After *Mitsubishi,* the First Circuit re-examined the text, history, and purposes of Title VII claims and found that Congress had "clearly" shown its intention to preclude arbitration. *Utley,* 883 F.2d at 187. Congress has since endorsed this interpretation of the proper place of courts and arbitrators in Title VII, stating both in the amended text of the Act and in its legislative history that mandatory arbitration agreements have no place under Title VII and should not be enforced.

#### 2. *The Civil Rights Act of 1991*

In the year that *Gilmer* was decided, Congress overwhelmingly voted to amend Title VII to restore and reinforce the civil rights of victims of employment discrimination. The Civil Rights and Women's Equity in Employment Act of 1991 ("1991 Civil Rights Act") had two chief goals: to increase the remedies available under Title VII, so that plaintiffs could for the first time be fully compensated for the injuries of discrimination; and to make enforcement of the Act more effective through substantive and procedural amendments that would make discrimination suits easier to bring and to prove. Underlying all of these changes was Congress' strong belief that civil rights enforcement benefitted the nation as a whole.[13] And that public goal of eradicating discrimination was primarily to be achieved through private litigation. As the House Education and Labor Committee succinctly summarized: "In enacting Title VII, Congress intended to vindicate the substantial public interest in a discrimination-free workplace by encouraging private citizens to enforce the statute's guarantees." H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 75 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 613.

The importance of enforcement by private litigants spurred a series of amendments that, as described below, bring Title VII within *Gilmer*'s exception to the enforcement of mandatory pre-dispute arbitration

---

13. "America is a better country," the House Education and Labor Committee explained, "because we as a people have moved forward toward the goal of eradicating discrimination.... Now— when more women and minorities are needed in the labor market to maintain the health and vitality of our economy—is the time to restore the strength of federal equal employment protection...." H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 15–16 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 553–54.

agreements. The text and legislative history of the one amendment that spoke directly to the use of alternative dispute resolution unambiguously reject mandatory arbitration agreements. This amendment, in turn, was part of a comprehensive scheme intended to strengthen the ability of private plaintiffs to bring and win civil rights claims in public fora, rather than private arbitration.

In interpreting the 1991 amendments I must give the statute "the largest latitude consistent with the words employed ..." H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 87 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 625. The Civil Rights Act of 1991 had been prompted by a series of 1989 Supreme Court interpretations of Title VII decisions that Congress found represented an unduly narrow and restrictive reading of the law. *Id.* at 88, *reprinted in* 1991 U.S.C.C.A.N. at 626. For this reason, Congress codified for future courts what had until then been an unquestioned canon of judicial interpretation: that all civil rights laws were to be interpreted broadly, so as to best effectuate their remedial purposes. *See, e.g., Dennis v. Higgins,* 498 U.S. 439, 443, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991); *Corning Glass Works v. Brennan,* 417 U.S. 188, 208, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). "In codifying this rule of construction, the Congress intends that when the statutory terms in civil rights law are susceptible to alternative interpretations, the courts are to select the construction which most effectively advances the underlying congressional purpose ..." H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 88 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 626; H.R.Rep. No. 40(II), 102 Cong., 1st Sess. 34 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 694, 728.

**a.** ***The Express Preclusion of Mandatory, Pre–Dispute Arbitration Agreements***

Section 118 of the 1991 Civil Rights Act speaks directly to the issue of the arbitrability of Title VII claims. It encourages the use of alternative dispute resolution "where appropriate and to the extent authorized by law." P.L. 102–166 § 118, 105 Stat. 1071, 1081 (1991)(codified as a historical and statutory note to 42 U.S.C. § 1981). The radical change in the enforceability of those agreements that the *Gilmer* Court would announce took place several months *after* the Civil Rights Act was drafted with this language in it, but before it was passed. The question then is whether "where appropriate and to the extent authorized by law" referred to the bar on pre-dispute arbitration agreements, as set out by *Gardner–Denver* and its progeny, existing at the time of the draft, or to *Gilmer's* acceptance of such agreements, not yet decided but perhaps presaged by other Supreme Court cases outside the civil rights field.[14]

The House Reports drafted pre-*Gilmer*, resolve any doubt on this question: They explicitly state that "any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII." H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 97 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 635, H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 41 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 734–35. Section 118, they explain, is intended to be consistent with *Gardner–Denver*. *Id.* Echoing words taken directly from *Gardner–Denver*, Congress stated that the encouragement of ADR was meant to "supplement, not supplant" existing procedures (*see Gardner–Denver,* 415 U.S. at 48), and should not be "used to preclude rights and remedies that would otherwise be available." H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 97 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 635, H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 41 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 734–35.

Not only did Congress endorse *Gardner–Denver,* it provided further evidence of its intent to preclude mandatory arbitration by rejecting an amendment that would have approximated the effect of *Gilmer*. *See*

---

**14.** Defendants' *amici* argue that it would be an "error of logic" to interpret encouragement of arbitration "where appropriate and to the extent authorized by law" as precluding arbitration in all other circumstances. The position is a curious one. Given that the other circumstances would, by definition, be those where arbitration was inappropriate and not authorized by law, however, it seems safe to conclude that Congress intended to preclude arbitration in such cases.

*Thompson v. Thompson*, 484 U.S. 174, 185, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (Congress' choice of one of several conflicting proposals provides "strong evidence" of its intent). The rejected amendment would have implicitly endorsed mandatory arbitration agreements by encouraging the use of arbitration "in place of judicial resolution." Such agreements, the Education and Labor Committee explained, would have allowed employers to "refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints." This "would fly in the face of Supreme Court decisions holding that workers have the right to go to court, rather than being forced into compulsory arbitration, to resolve important statutory and constitutional rights ..." "American workers," the Committee concluded, "should not be forced to choose between their jobs and their civil rights." H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 104 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 642.

■ It is crucial to note here that not only does this legislative history provide an authoritative interpretation of the text of the statute, it also provides an independent ground for refusing to compel arbitration in this case. The Supreme Court has repeated in all of its recent decisions applying the FAA to statutory claims that Congressional intent to preclude compulsory arbitration can be found in the statute's "Legislative history." [15] *Mitsubishi*, 473 U.S. at 628; *McMahon*, 482 U.S. at 227; *Gilmer*, 500 U.S. at 26. Committee Reports, in turn, are the most authoritative source of that history. *See Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the legislature's intent lies in the Committee Reports on the bill ...."); *Zuber v.*

*Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *Davis v. Lukhard*, 788 F.2d 973, 981 (4th Cir.1986), *cert. denied*, 479 U.S. 868, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986).

This interpretation of Section 118 is reinforced by reading it in the context of other references to dispute resolution in the 1991 Act. All of the ADR methods listed in Section 118 are consensual and non-binding: "settlement negotiations, conciliation, facilitation, mediation, factfinding, [and] minitrials...." Section 118. Wherever else Congress wrote of settlement and dispute resolution in 1991, in the various reports, it was referring to the *voluntary* settlement of *existing* disputes. For example, the Education and Labor Committee wrote favorably about voluntary employee efforts to settle their problems internally before filing complaints, but rejected amendments that would have made use of an internal grievance procedure mandatory. H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 103 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 641. Title VII's goal of "encouraging voluntary settlement" is referred to at several points but is always understood as the resolution of existing claims and often conflated with the statutory conciliation process—which by definition only involves existing claims and is not binding. Many of these references, moreover, cite *Gardner–Denver* itself. *See, e.g.,* H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 51 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 589 n. 43 (citing *Gardner–Denver* and *Firefighters v. Cleveland*, 478 U.S. 501, 515, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986)); *id.* at 62, *reprinted in* 1991 U.S.C.C.A.N. at 600 n. 57 (*citing Carson v. American Brands*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (*citing Gardner–Denver* )); *id* at 603, 611. As discussed

**15.** The defendants argue that only the statute's text is significant, citing to Justice Scalia's concurrence in *Landgraf v. USI Film Products*, 511 U.S. 244, 286, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Justice Scalia's concurrence is inapposite. The issue in *Landgraf* was the retroactivity of the 1991 Civil Rights Act's damages and jury trial provisions to a case pending on appeal when the Act was passed. The decision therefore involved the application of a different rule, the rule that "a legislative enactment affecting substantive rights does not apply retroactively absent clear statement to the contrary." *Land-* *graf*, 511 U.S. at 286. This rule is "of great antiquity" and derived from a line of cases distinct from the FAA caselaw at issue here. *Id.* at 286, citing *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964); *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162–163, 48 S.Ct. 236, 72 L.Ed. 509 (1928).

above, *Gardner–Denver* analyzed the importance of conciliation and voluntary settlement to the Title VII scheme but concluded that these efforts did not displace the federal court's "final authority" for enforcing the law. To take these references to the importance of settlement and conciliation as an endorsement of *Gilmer* would be to turn upside down both the 1991 amendments and the caselaw they relied on.

In spite of this language, defendants argue that in passing the 1991 amendments, Congress endorsed rather than repudiated *Gilmer*. Defendants and their *amici* make much of the fact that in a statute designed in large part to overrule Supreme Court precedent, Congress made no mention of *Gilmer*. Because Congress knew how to overrule the Supreme Court, and did so quite specifically in these amendments, the failure to overrule *Gilmer* suggests its endorsement. According to the defendants, when Congress spoke of arbitration "where appropriate and to the extent authorized by law," it had *Gilmer*, not *Gardner–Denver*, in mind.

■ Even without express legislative history to the contrary, this argument would fail as a matter of logic, precedent, and simple chronology. When the Civil Rights Act was conceived and drafted, *Gilmer* had yet to be decided. *Gilmer* was decided in May, 1991; the first version of what was to become the Civil Rights Act had been introduced over a year before, in February of 1990; it was passed by both the House and Senate, but vetoed by President Bush. H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 53 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 738–39. The final drafts of the 1991 bill were reported out of the House Labor and Judiciary Committees in March of 1991, still several months before *Gilmer*. H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 18 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 556, H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 2 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 694–95. Indeed,

the legislative history refers at several places to the Supreme Court cases "of 1989" that it meant to overturn. H.R.Rep. No. 40(I), 102d Cong., 1st Sess. 88 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 626; H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 53 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 738–39. Thus, when Congress endorsed *Gardner–Denver*, it had no reason to consider whether its definition of when arbitration is appropriate and authorized by law had been called into question. As the Supreme Court has held, "evaluation of congressional action must take into account its contemporary legal context," rather than reading back in time subsequent Court interpretations of similar language in other statutes. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).[16]

In short, when Congress drafted Section 118, it relied on a long-standing judicial doctrine that pre-dispute agreements that compelled the arbitration of civil rights claims were unenforceable. That was still the law in the Spring of 1991; Congress cited it as such in explaining what it meant by "where appropriate and authorized by law."

Nor, finally, is there any evidence that the subsequent decision in *Gilmer* affected Congressional intent with regard to Section 118. In the House debate immediately prior to the Act's passage on November 7, 1991, the chair of the House Committee on Education and Labor reiterated that Section 118 was "intended to be consistent with … *Alexander v. Gardner–Denver*" and added for good measure:

This section contemplates the use of voluntary arbitration to resolve specific disputes after they have arisen, not coercive attempts to force employees in advance to forgo statutory rights. *No approval whatsoever is intended of the Supreme Court's recent decision in* Gilmer … *or any ap-*

---

**16.** "[I]t is not only appropriate but also realistic," the Court remarked, "to presume that Congress was thoroughly familiar with … unusually important precedents from this and other federal courts and that it expected its enactment to be interpreted in conformity with them." *Id.* 441 U.S. at 699; *accord Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) (Congress is presumed to be aware of

"existing law when it passes legislation"); *Midlantic Nat'l Bank v. New Jersey Dep't of Environmental Protection*, 474 U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.").

*plication or extension of it to Title VII.* 137 Cong.Rec. H9505–01, *H9530 (November 7, 1991). (emphasis added).

The only evidence that the defendants master to counter this emphatic rejection of their position is Representative Henry Hyde's interpretation of § 118:

This provision encourages the use of alternative means of dispute resolution, including binding arbitration, where the parties knowingly and voluntarily elect to use these methods. In light of the litigation crisis facing this country and the increasing sophistication and reliability of the alternatives to litigation, there is no reason to disfavor the use of such forums. *See Gilmer . . . .* 137 Cong.Rec. H9505–01, *H9548 (November 7, 1991).

This single comment sheds little, if any, light on the bill's meaning and purpose. *See Garcia,* 469 U.S. at 76 (*citing Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 71 L.Ed.2d 715 (1982); *United States v. O'Brien,* 391 U.S. 367, 385, 88 S.Ct. 1673, 20 L.Ed.2d 672(1968); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766(1980)) ("We have eschewed reliance on the passing comments of one Member . . . and casual statements from the floor debates."). Moreover, whatever Hyde's views of *Gilmer,* he does not seem to have believed that Section 118 enacted them into law. As the ranking Minority Member of the House Judiciary Committee, he had urged that the bill not be passed at all. H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 80 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 766. Among his many regrets was that Section 118, which encouraged only "voluntary" agreements, was merely "an empty promise" that would do little to prevent litigation. *Id.* at 78, *reprinted in* 1991 U.S.C.C.A.N. at 764.

In any event, it was not at all clear that Congress needed to overrule a case interpreting the *ADEA*'s enforcement procedures in order to preserve access to federal courts under *Title VII.* Although the substantive provisions of the ADEA were modeled on Title VII, its remedial and procedural provisions were originally modelled on the Fair Labor Standards Act. *Lorillard v. Pons,* 434 U.S. 575, 578, 584, 98 S.Ct. 866, 55 L.Ed.2d 40 113 Cong. Rec. 31254 (1967). Even after agency enforcement of the ADEA was transferred by executive order from the Department of Labor to the EEOC, courts continued to recognize that its procedural provisions were distinct from those of Title VII. *See, e.g., McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 357, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985); *Lehman v. Nakshian,* 453 U.S. 156, 166–67, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981).

Instead of overruling *Gilmer,* or for that matter, *Mitsubishi, McMahon,* or *Rodriguez,* Congress could merely follow the suggestion of those cases and make clear its intent to preclude enforcement of pre-dispute arbitration agreements. This, as described above, it did.

### b. *The Structure and Purpose of the 1991 Act*

An examination of the structure and purpose of the 1991 Civil Rights Act as a whole reinforces this reading of Section 118 and its legislative history. The Congressional preclusion of mandatory arbitration of Title VII claims formed part of an overall effort to strengthen and reemphasize the private plaintiff's role in vindicating public rights. The 1991 amendments placed a strong emphasis on the Act's public deterrent functions.[17]

The concern for deterrence and enforcement motivated all of the Act's major amendments to Title VII. Congress set out to overturn a series of recent Supreme Court decisions because they had made it "far more difficult [for victims of discrimination] to vindicate their claims and the over-

---

**17.** Deterrence and compensation were described as the Act's "twin objectives" and "dual goals." H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 79 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 617, H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 17 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 710. The House Judiciary Committee described one of the Act's "primary purposes" as "to strengthen existing protections and remedies available . . . [in order] to provide more effective deterrence and adequate compensation. . . ." H.R.Rep. No. 40(II) 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 694.

riding public interest in eliminating ... discrimination." H.R.Rep. No. 40(I) 102d Cong., 1st Sess. 30 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 568. In doing so, Congress was concerned not merely about justice for individual plaintiffs but also about the "impact on the American Workplace" of judicial interpretations of Title VII. *Id.* at 25, *reprinted in* 1991 U.S.C.C.A.N. at 563.[18]

The primacy of public rights in the Title VII scheme came out most clearly in the clarification of the law in mixed motive cases. 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(B). If an employer could show that a partially discriminatory action was also taken for legitimate, non-discriminatory reasons, an individual plaintiff would be not be entitled to reinstatement or backpay. Nonetheless, she would still be able to vindicate the rights of others through seeking declaratory and injunctive relief and punitive damages. Moreover, as a private attorney general, she would be entitled to attorneys' fees.

A commitment to vindicating public rights also motivated the 1991 Civil Rights Act's dramatic expansion of the remedies available under Title VII, including full compensatory damages as well as equitable relief. Congress believed that "permitting the recovery of such damages would enhance the effectiveness of Title VII by making victims of intentional discrimination whole ..., by deterring future acts of discrimination and by encouraging private enforcement." H.R.Rep. No. 40(I) 70, *reprinted in* 1991 U.S.C.C.A.N. at 608.[19]

This emphasis on the vindication of public rights makes the reasoning behind *Mitsubishi, McMahon,* and *Rodriguez* inapplicable to Title VII. The Supreme Court has recognized an inherent tension between mandatory arbitration and the private attorney general function normally fulfilled by plaintiffs who assert statutory, public rights claims. In each of the leading cases on the arbitra-

tion of statutory claims, the Court reasoned that the relevant statutory provisions had compensation as their primary purpose, not the vindication of public rights. Thus, in *Mitsubishi,* the Court explained that the anti-trust law's treble damages provision "seeks primarily to enable an injured competitor to gain compensation for that injury." *Mitsubishi,* 473 U.S. at 635. It is "in essence a remedial provision," for the benefit of "individuals." *Id.* at 635–636 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 485–486, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)); 21 Cong. Rec, 1767–1768 (1890). The "policing function," although "important," is "incidental." *Id.* 473 U.S. at 635. The Court reiterated this interpretation of statutory priorities in *McMahon,* with regard to both the Securities Exchange Act and RICO. The legislative history of the Securities and Exchange Act, it held, revealed that Congress had "focus[ed] on the remedial function" of that act's treble damages provision, while "[t]he policing function ..., although important, was a secondary concern." *McMahon,* 482 U.S. at 240–241. "The private attorney general role for the typical RICO plaintiff," the Court found, was even "less plausible...." *Id.* at 242.

In contrast, the Civil Rights Act of 1991 reaffirmed that the typical plaintiff's private attorney general role is more than plausible; it is essential. What is not plausible is that the same Act would have nonetheless undermined that role by endorsing private mandatory pre-dispute arbitration agreements.

### c. *The creation of a right to a jury trial*

It is similarly unlikely that the same Congress would in a single act create a new constitutionally-based right to a jury trial for Title VII plaintiffs, only to erode that right by endorsing mandatory pre-dispute arbitration agreements. Before the passage of the 1991 Civil Rights Act, most courts had con-

---

**18.** The single case of *Griggs v. Duke Power,* for example, was described as one of the "great success stories in American law," leading countless employers who were not themselves involved in litigation to rethink and re-examine their employment practices. *Id.* at 26, *reprinted in* 1991 U.S.C.C.A.N. at 564.

**19.** Strengthened and expanded fee-shifting provisions likewise reflected the "compelling need" to

ensure that civil rights plaintiffs would find competent counsel willing to press their claims and "enforce the statute for the benefit of all Americans". *Id.* at 76–79, *reprinted in* 1991 U.S.C.C.A.N. at 614–17. Uncertainty about recovering legal fees could "frustrate the intent of Congress to protect the public interest by eliminating employment discrimination." H.R.Rep. No. 40(II) 102d Cong., 1st Sess. 30 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 723.

cluded that Title VII plaintiffs had no right to a jury trial. *See, e.g., CIR v. Schleier*, 515 U.S. 323, 335, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995); *Lehman v. Nakshian*, 453 U.S. at 164; *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 375 & n. 19, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Curtis v. Loether*, 415 U.S. 189, 196, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Ramos v. Roche Products*, 936 F.2d 43, 50 (1st Cir.1991). In order to "protect the rights of all persons under the Seventh Amendment ..." H.R.Rep. 40(II) 29, *reprinted in* 1991 U.S.C.C.A.N. at 722, the Civil Rights Act of 1991 finally recognized a right to a jury trial for victims of intentional discrimination.[20] It makes little sense that Congress would have finally recognized this right in one section of 1991 Act, and then undermined it in another. *See Pryner*, 109 F.3d at 363.

## C. *The Adequacy of the NYSE Forum to vindicate Rosenberg's ADEA claim*

Although Title VII and the ADEA share many of the same goals and substantive provisions, *Lorillard*, 434 U.S. at 584, Congress has not clearly expressed its intent to preclude enforcement of pre-dispute arbitration agreements under the ADEA.[21] In *Gilmer*, the plaintiff had conceded that the Act's text and legislative history evinced no intent to preclude compulsory arbitration, and the Supreme Court found no inherent conflict between compulsory arbitration and the ADEA's purposes. In order to decide whether to compel arbitration of Rosenberg's

ADEA claim, I must therefore turn to the third prong of the *Mitsubishi* test: can Rosenberg effectively vindicate her ADEA rights in the NYSE arbitration system?

As the defendants have rightly pointed out, the *Gilmer* court considered this very arbitral system and declined to find it inadequate. Like the plaintiffs in *Mitsubishi*, *McMahon*, and *Rodriguez*, Gilmer had confined his argument to an abstract critique of the impartiality, competence, and legal powers of arbitrators in general. While rejecting Gilmer's facial challenge to arbitration, as it had in the prior three cases, the Supreme Court left open the possibility of evaluating the adequacy of the arbitral forum in specific cases. *Gilmer*, 500 U.S. at 30, 33 (rejecting Gilmer's speculations about the NYSE forum and stating that "the claimed procedural inadequacies ... [are] best left for resolution in specific cases.")

In this case, Rosenberg has risen to the Supreme Court's challenge. She has not presented, nor would I credit, generalized arguments about the inherent incapacity of arbitrators to resolve statutory civil rights claims. She has instead put forward a detailed, concrete, and voluminous critique of the NYSE system. She offers depositions of securities industry personnel, official securities arbitration manuals, arbitration records, and reports of government investigations all purporting to raise doubts about the adequacy of the NYSE forum in particular.

Rosenberg first argues that NYSE arbitration panels are comprised mainly of white

20. "The jury system," the Education and Labor Committee remarked, "is the cornerstone of our system of civil justice." H.R.Rep. 40(I) 102d Cong., 1st Sess. 72 (1991), *reprinted in* 1991 U.S.C.C.A.N. at 610. The Committee rejected as probably unconstitutional a minority amendment that would have eliminated the right to a jury trial by dubbing the new Title VII remedies "equitable." *Id.* at 103, *reprinted in* 1991 U.S.C.C.A.N. at 641.

21. It is interesting to note that Congress, in its Amendments to the ADA and Title VII, has expressly endorsed *Gardner–Denver* and rejected compulsory arbitration when it has recently considered the use of alternative dispute resolution in civil rights claims. *See* Americans with Disabilities Act, § 12212, 42 U.S.C. § 12102 ("Where appropriate and to the extent authorized by law, the use of ... arbitration, is encouraged...."); H.R.Rep. No. 485(III), 101st Cong.,

2d Sess. 76–77 (1990), *repr. in* 1990 U.S.C.C.A.N. 445, 499–500 (explaining this language to mean that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provision of this Act, and endorsing *Gardner–Denver*); H.R.Conf.Rep. No. 596, 101st Cong., 2d Sess. 89 (1990), *repr. in* 1990 U.S.C.C.A.N. 565, 598 (adopting this statement by reference); *Mandatory Arbitration*, 109 Harv.l.Rev. at 1677 (doubting whether *Gilmer* should properly be extended to the ADA, because of this legislative history). In the Committee Reports to the 1991 Civil Rights Act of 1991 discussed above, Congress also suggested that the rule against compulsory arbitration it was announcing for Title VII should apply to the ADEA as well. H.R.Rep. No. 40(I) at 97, *reprinted in* 1991 U.S.C.C.A.N. at 635.

men whose lack of sympathy towards discrimination claims is borne out by women's greater success in federal and state courts than before the NYSE. *See* General Accounting Office, *Employment Discrimination: How Registered Representatives Fare in Discrimination Disputes* 8, GAO/HEHS–94–17 (1994) (estimating that 89% of NYSE arbitrators were men, and of those whose race and age could be identified, 97% were white, and the average age of male arbitrators was 60).

I am not persuaded. The parties have presented conflicting data on the gender, age, and ethnic background of the NYSE arbitrators, the percentage of women employees who prevail at arbitration, and on what grounds, and the comparative rates of success and amount of recovery for women bringing Title VII suits in court and before a jury of their peers. Even accepting *arguendo* Rosenberg's argument that women who bring civil rights claims to court win more and larger damage awards, there is little evidence of the relative merit of these claims that would allow me to find an unmistakable pattern of bias within the NYSE system based on these outcomes alone.

However, what is deeply troubling is what I can only describe as a structural bias in the system—the extent to which the NYSE arbitration system is dominated by the securities industry, that is, by the employment side of this dispute. The securities arbitration systems are part of a scheme in which securities industry firms form self-regulating organizations (SROs) to police themselves. *See* 15 U.S.C. §§ 78a–78s. The securities firms are called "member firms" of the SROs, but they are more than members: They "govern" the SROs as part of the self-regulating scheme. Bales, *supra*, at 90. The SROs are "essentially securities industry employers' association[s]." *Id.* at 95. The SROs, in turn, run almost every aspect of the arbitration process in which the employees must have their employment discrimination cases resolved. *See* William M. Howard, *Arbitrating Employment Discrimination Claims: Do You Really Have To? Do You Really Want To?*, 43 Drake L.Rev. 255, 275 (1994) (pointing out that "a broker accused of discriminatory employment practices would be a member of the SRO administering and orchestrating the arbitration proceeding. . . .") Merrill Lynch is a "member firm" of all three of the SROs with which it requires its employees to register: the NYSE, NASD, and ASE. In 1996, the Chairman of Merrill Lynch was on the Board of the NYSE.[22]

### 1. Norms and Standards of Arbitral Impartiality

To determine whether this structure is biased requires first a review of the norms and standards of arbitral impartiality. To be sure, should an Article III judge be employed or directed by one side to a dis-

**22.** The other members of the Board were almost entirely industry representatives: James A. Jacobson, Senior Managing Member, Benjamin Jacobson & Sons, LLC; Deryck C. Maughan, Chairman and Chief Executive Officer, Salomon Brothers Inc.; Paul A. Allaire, Chairman and Chief Executive Officer, Xerox Corporation; Geoffrey C. Bible, Chairman and Chief Executive Office, Philip Morris Companies Inc.; Charles J. Bocklet, Jr., Managing Partner, Bocklet & Co.; J. Gary Burkhead, President and Chief Executive Officer, Fidelity Management & Research Company; Michael A. David–Weill, Chairman, Lazard Frères & Co LLC; Benjamin H. Griswold, IV, Chairman, Alex. Brown & Sons Incorporated; A. James Jacoby, Senior Managing Partner, Asiel & Co., LLC; Edgar D, Janotta, Sr., Senior Principal, William Blair & Company, L.L.C.; Ralph S. Larsen, Chairman and Chief Executive Officer, Johnson & Johnson; Bernard Marcus; Chairman and Chief Executive Officer, The Home Depot, Inc.; Reuben Mark, Chairman and Chief Executive Officer, Colgate–Palmolive Company; Sir Colin Marshall, Chairman, British Airways Plc; Anthony J.F. O'Reilly, Chairman and Chief Executive Officer, H.J. Heinz Company; Robert B. Fagenson, President, Fagenson & Company, Inc.; Richard B. Fisher, Chairman, Morgan Stanley Group, Inc.; Richard S. Fuld, Jr., Chairman and Chief Executive Officer, Lehman Brothers Holdings Inc.; Maurice R. Greenberg, Chairman, American International Group, Inc.; Michael D. Robbins, Chairman, Robbins & Henderson L.L.C.; Alex Trotman, Chairman, President and Chief Executive Officer, Ford Motor Company. The Chairman and President and Chief Operating Officer listed no official affiliation besides that of the NYSE itself. The only two non-industry members were Clifton R. Wharton, Jr., Former Chairman and Chief Executive Officer, TIAA/CREF, and Kathryn J. Whitmire, Director, National Resource Center for Public Leadership, the Academy of Leadership, University of Maryland. *NYSE 1996 Annual Report*, http://www.nyse.com/public/thenyse.

pute, it would be certain grounds for recusal if not disciplinary action. Even in the more flexible arbitration context, federal law and arbitral norms and practices have evolved standards of impartiality that require arbitrators to be independent of the parties before them. These norms require that arbitrators have "no connection with the parties ... which might give the appearance of their being otherwise" than "completely impartial." Robert M. Rodman, *Commercial Arbitration with Forms* § 9.9 (1984). In addition, both parties to a dispute must have an equal right to control the appointment of the arbitral panel, and neither side should play a disproportionate role in the decision-making. *Ex parte* communications with one side to an arbitration can constitute a violation of the arbitrator's Code of Ethics, *See Metropolitan Property & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.*, 780 F.Supp. 885, 893 (D.Conn.1991), and are prohibited by American Arbitration Association ("AAA") rules, unless the parties agree in advance to permit them. AAA *Rules, supra,* Rule 20; AAA, *Guide for Employment Arbitrators, supra, reprinted in* SB31 ALI–ABA at 116 ("An arbitrator should not communicate with the parties and their counsel except in the presence of both parties.").

The chief guarantor of arbitrators' fairness and competence is the parties' powers to appoint the panel. This power has been called the "essence of arbitration" and a "condition of [the parties'] trust" in arbitration. Alan Scott Rau, *Integrity in Private Judging,* 38 S.Tex.L.Rev. 485, 506 & n. 82 (1997) *(quoting* Sir Michael Mustill, *Multipartite Arbitrations: An Agenda for Law–Makers,* 7 Arb. Int'l 393, 399 (1991) and Pierre Lalive, *Conclusions, in The Arbitral Process and the Independence of Arbitrators* 119, 123 (1991)); *see also* Martin H. Malin and Robert F. Ladenson, *Privatizing Justice: A Jurisprudential Perspective on Labor and Employment Arbitration From the Steelworkers Trilogy to Gilmer,* 44 Hastings

L.J. 1187, 1204 (1993) (describing the power to appoint the arbitrator as a crucial check on arbitral discretion). Selecting the arbitrator is "the most important decision arbitrating parties can make." Ian Macneil et al., 3 *Federal Arbitration Law: Agreements, Awards, and Remedies under the Federal Arbitration Act* § 27.1, at 27:2 (1995 & Supp. 1997).

Where arbitrators are not appointed by a neutral party, such as the AAA, both parties must have an equal right to participate in the appointment process. In addition, there is normally a third "neutral" arbitrator who is expected to have a "controlling voice" in the decision. Maynard E. Pirsig, *Some Comments on Arbitration Legislation and the Uniform Act,* 10 Vand.L.Rev. 685, 701 (1957), *as quoted in* Rau, 38 S.Tex.L.Rev. at 499. The right to appoint the panel is almost never given to one side. *Mandatory Arbitration,* 109 Harv.L.Rev. at 1686 (arguing that fairness requires that employers and employees should participate equally in the arbitrator selection process); Carole Silver, *Models of Quality for Third Parties in Alternative Dispute Resolution,* 12 Ohio St.J. on Disp. Resol. 37, 53 (1996) (the parties should always have an equal relationship to the third-party decision-maker). These rules reflect the basic recognition that party-appointed arbitrators cannot be neutral. *See, e.g.,* Rau, 38 S.Tex.L.Rev. at 508 (dismissing as "mythology" the idea that a party-appointed arbitrator can ever be neutral); *Metropolitan Property & Cas.,* 780 F.Supp. at 891 (describing the "common acceptance" of the fact that party-appointed arbitrators cannot be neutral).

Recently drafted standards for arbitral "due process" have reaffirmed the importance of the parties' rights to select the arbitral panel. Both the American Bar Association's ADR Task Force and the American Arbitration Association mandate appointment procedures that give each party scrupulously equal rights in the process.[23] A leading dis-

**23.** The American Bar Association Task Force on Alternative Dispute Resolution in Employment recently drafted a "Due Process Protocol for Mediation and Arbitration of Statutory Disputes arising out of the Employment Relationship." Among its recommendations are that the panel be selected by the parties alternately striking names from a roster prepared by an independent agency. If this procedure is "unacceptable or unsuccessful," the independent agency should appoint the arbitrator. *Prototype Agreement on Job Bias Dispute Resolution, reprinted in* Panken, et al., SB31 ALI–ABA at 88, 91. The American Arbitration Association's new rules for employment arbitration also require appointment of an arbitrator "mutually acceptable" to the parties,

pute resolution firm JAMS/Endispute refuses to accept any case in which the "employers ... have exclusive power to appoint arbitrators." *JAMS/Endispute Issues Minimum Standards for Employment Arbitration*, 6 World Arb. & Mediation Rep. 50 (1995). The Commission on the Future of Worker–Management Relations ("the Reich Commission") recently found that the requirement of mutuality in the appointment process was still accepted as a general arbitral norm. It reported a "high degree of consensus, including among employer groups, regarding the quality standards necessary to ensure effective protection of employees' substantive legal rights" in arbitration. Commission on the Future of Worker–Management Relations, *Report and Recommendations* ("Reich Report") 237 (1994). Among the recommendations it offered for implementing these standards was that "[n]either party should be able to limit the roster unilaterally...." *Id.* at 238.

Because of the importance of the appointment process to the fairness of any arbitration proceeding, some courts have refused to enforce arbitration agreements that designate a panel closely linked to one party, especially if that party drafted the underlying agreement. According to the leading treatise on federal arbitration, the FAA will not countenance agreements that allow one party to appoint an arbitral panel "intimately connected to it." Macneil, et al., *Federal Arbitration Law* § 28.2.5.2, 28:36 & n. 106. "[W]here close ties between arbitrator and party reflect gross disparity in bargaining power and a lack of alternatives on the part of the weaker party ...," the treatise concludes, "a court should refuse to enforce the selection mechanism." *Id.*

The Supreme Court of California refused to enforce an arbitration agreement contained in a standardized form contract required to be used by all members of the American Federation of Musicians (A.F. of M.). *Bill Graham v. Scissor–Tail, Inc.*, 28 Cal.3d 807, 171 Cal.Rptr. 604, 623 P.2d 165 (1990) The arbitral agreement was remark-ably similar in structure to the one presented here: all members of the music industry were members of the A.F. of M., and every member of the A.F. of M. was required to use the standard contract containing a clause mandating arbitration in front of a board drawn from the union's own International Executive Board. *Id.* 623 P.2d at 172. The Court held:

> the "minimum levels of integrity" which are requisite to a contractual arrangement for the nonjudicial resolution of disputes are not achieved by an arrangement which designates the union of one of the parties as the arbitrator of disputes arising out of employment especially when, as here, the arrangement is the product of circumstances indicative of adhesion. *Id.* at 177.

Both state and federal courts have invalidated or reformed arbitration agreements that provided for a panel institutionally linked to or chosen by one party alone. *See McConnell v. Howard Univ.*, 818 F.2d 58, 68 n. 12 (D.C.Cir.1987) ("Even if it could be said that the parties "agreed" to make the [university] Board of Trustees" the arbitrator of their disputes, court would not defer to its decision); *Sam Kane Packing Co. v. Amalgamated Meat Cutters and Butcher Workmen of N. Am.*, 477 F.2d 1128, 1136 (5th Cir.1973) (decision by a single, union-appointed arbitrator vacated, although allowed by the contract, as "in conflict with the concept of true arbitration"); *Bennish v. North Carolina Dance Theater,* 108 N.C.App. 42, 422 S.E.2d 335, 337–38 (1992) (in order to "preserve the purposes" of the FAA, the trial court must substitute a neutral arbitrator, in place of the panel designated in the parties' contract, which contained both a trustee and a staff member of the defendant); *Smith v. Rubloff*, 187 Ga.App. 317, 370 S.E.2d 159, 160 (1988) (arbitration agreement would be "invalid" because it provided for a panel made up of an employee and two associates of one party); *Chimes v. Oritani Motor Hotel, Inc.*, 195 N.J.Super. 435, 480 A.2d 218, 223 (App. Div.1984) (following *Graham* ); *Manes v. Dallas Baptist College*, 638 S.W.2d 143, 145

or through a process in which both parties have an equal right to strike names from a list provided by the AAA and then rank the remaining names. Again, if the parties cannot select an arbitrator in this way, only the AAA can appoint one. AAA, *National Rules, supra,* Rule 12. The AAA may refuse to administer a case in a system that does not meet these standards. *Id.*, Introduction.

(Tex.Ct.App.—Dallas 1982) (an arbitration before the employer's Board of Trustees would be "totally inconsistent with the theory of arbitration"); *Cross & Brown Co. v. Nelson*, 4 A.D.2d 501, 167 N.Y.S.2d 573, 576 (N.Y.App.Div.1957) (an agreement designating one party's Board of Directors as the arbitral panel, "[a]part from outraging public policy, . . . is illusory").

### 2. Application of Norms of Arbitral Impartiality to the NYSE System

The NYSE cannot meet these minimal standards of arbitral independence. From the rules that govern arbitral procedure, through the selection of the arbitrators, to the details of discovery practice, the system is dominated by the NYSE itself. Merrill Lynch, in turn, helps govern the NYSE.

The rules of securities arbitration are drafted and proposed to the SEC by the Securities Industry Conference on Arbitration (SICA), a group composed primarily of members of the SROs and their trade association, the Securities Industry Association. The four "public members" from outside the securities industry are outnumbered more than two-to-one. Outside "regularly invited guests" include the SEC and the American Arbitration Association, but they cannot vote. *See* Masucci Dep. at 29. Member firms may also initiate rule changes by communicating their views directly to their SROs. In 1994, for example, the Securities Industry Association sent letters to both the NASD and the NYSE, urging them not to amend the U–4 to remove the requirement to arbitrate discrimination cases.[24] *Id* .

The SICA rules have established an entire arbitral structure dominated by the industry.

The NYSE Rules describe the arbitral system as follows:

> The Chairman of the Board of Directors [of the NYSE] .. shall appoint, subject to the approval of the Board of Directors, a Board of Arbitration to be composed of such number of *present or former members, allied members and officers of member corporations of the Exchange*[25] who are not members of the Board of Directors as the Chairman of the Board of Directors shall deem necessary to *serve at the pleasure of the Board of Directors. . . .* Rule 633, *NYSE Rules*, at 30 (emphasis added).

The Chairman likewise appoints the Director of Arbitration, who *must be "one of the officers or other employees of the exchange,"* Rule 635, *id.* (emphasis added) and who reports directly to the Senior Vice President and Secretary of the NYSE. *See* Buck Dep. at 67. Most disturbingly, the Chairman of the Board also recommends and appoints the arbitration pools from which individual arbitrators are chosen, including the pool of non-securities industry "public" arbitrators. Rule 634 *NYSE Rules* at 30; Bales, *supra* at 93. The Director of Arbitration in turn directly appoints the arbitral panels and may also appoint the panel's chair. Rule 607, *NYSE Rules*, at 11–12. This "creates an obvious appearance of potential bias." Bales, at 95.

The provision for one peremptory challenge and unlimited challenges for cause, Rule 609, *id.* at 12–13, cannot correct the fundamental imbalance in a system in which the entire initial panel and any replacements are appointed by the Director of Arbitration, Rule 608, *id.* at 12, that is, by an employee of the NYSE.[26] *See* Deposition of Robert S.

---

24. The NASD Director of Arbitration recognized this letter, which concluded "Please hold the line on this issue; otherwise you're going to have very cranky members after you." Masucci Dep. at 95–96. In 1994, similarly, the NASD Legal Advisory Board responded to comments and letters from member firms expressing "concern about the appropriateness of punitive damages ..." by drafting a report on "alternatives to punitive damages." The subcommittee, "recommended that the NASD place significant limitations" on such damages. Masucci Dep. at 54–61.

25. In 1995, the only member of the NASD's National Arbitration Committee with experience

in employment law cases was an officer with Merrill Lynch. Masucci Dep. at 12.

26. Admittedly, the industry makes some attempt to counter its own control over the entire apparatus by providing that in disputes involving "public customers" or employees, at least a majority of the panel must be "public" arbitrators, "knowledgeable in but ... not from the securities industry." SICA, *Code of Arbitration Procedure*, 14–15, 17–18 (1993). Nonetheless, it hardly comports with the traditional arbitral model to allow one side to select all of the arbitrators, both "public" and "industry" arbitrators. *See* discussion, *infra*.

Clemente, NYSE Director of Arbitration, at 55 (stating that the NYSE both does the "initial screening" of arbitrators and, if necessary "temporarily or permanently" disqualifies them from the NYSE pool); letter from William H. Donaldson, Chairman and Chief Executive Officer of the NYSE, to Brandon Brecker, Director, Division of Market Relations, SEC, of 9/30/94 at 2–3 (describing the process of selection of arbitrators by "the Exchange's arbitration staff," the type of experience "we would look for" in an arbitrator and his belief that "we can appoint" appropriate panels in employment discrimination cases).

Even the information that the parties must rely on to challenge appointed arbitrators or police the guarantee of participation by "public," non-industry arbitrators is maintained by NYSE staff. Letter from Richard G. Ketchum, Director, SEC Division of Market Regulation, to Richard Grasso, President NYSE, of 1/8/91 at 5–9. SEC investigations have noted a disturbing series of lapses at the NYSE that undermine a claimant's ability to exercise what little control she has over the selection process: information about the arbitrators is often out-of date, incorrect, *id.* at 5–9, or provided at such short notice that "a party may be prohibited from effectively challenging an arbitrator's selection for the panel." *Id.* at 20. The SEC informed the NYSE that it was also concerned that "parties are not being informed of what would sustain a challenge for cause—a problem compounded by arbitrator profiles containing an amount of information insufficient for the effective use of challenges." *Id.* at 29. Even after these criticisms from the SEC, these deficiencies were not corrected. *See* GAO, *Employment Discrimination,* at 15.

Securities industry employees participate directly in key stages of the arbitral process. The Director of Arbitration makes important procedural decisions. He or she decides how many peremptory challenges to allow the parties, Rule 609, *NYSE Rules,* at 12, whether to extend time to file or answer pleadings, Rule 612(c)(5), *id.* at 16, and whether to allow "preliminary" joinder of parties and consolidation of claims. Rule 612, *id.* at 16–17. He or she has the discretion to schedule a pre-hearing conference and designate the person who shall preside over it. Alternatively, the Director of Arbitration may appoint a single member of the arbitration panel to resolve all pre-hearing issues. Rule 619(e), *id.* at 20–21.

Lower level industry staff may also participate directly in the arbitration. They are empowered to decide discovery disputes and reduce the arbitral award to writing. SICA, *Arbitrators Manual,* at 11, 31. In spite of arbitral standards discouraging or prohibiting *ex parte* communications, industry staff also act as "procedural advisors" in *ex parte,* off-the-record sessions in which arbitrators privately discuss the case amongst themselves. *Id.* at 22.

Dominance of an arbitral system by one side in the dispute does not comport with any model of arbitral impartiality, especially when that dominance takes the form of selecting the entire arbitrator pool, appointing the individual arbitration panels, and making important procedural and discovery decisions.

To be sure, if private parties contracting over private rights choose to resolve their disputes through one party's internal arbitration system, this Court would have little need to question their decision. This case, however, involves public rights. As such, the *Mitsubishi* trilogy directs me to consider whether the arbitral forum is adequate. *McMahon,* 482 U.S. at 240–42; *Mitsubishi,* 473 U.S. at 636–37.

Indeed, even the *Gilmer* Court has reiterated *Gardner–Denver's* concern that a claimant may not be able to vindicate her rights in an arbitral forum in which key decisions are made by her union. *Gilmer,* 500 U.S. at 35; *Gardner–Denver,* 415 U.S. at 58 n. 19; *accord Barrentine,* 450 U.S. at 750 (Burger, C.J., dissenting) ("For federal courts to defer to arbitral decisions reached by the same combination of forces that had long perpetuated invidious discrimination would have made the foxes guardians of the chickens.") There is no less reason for concern if fundamental decisions are made by the employer's own trade association. Whatever the competence or fairness of individual arbitrators who participate the NYSE system, its structural imbalance makes it an inadequate forum for vindicating civil rights.

In finding that the NYSE forum is inadequate to vindicate Rosenberg's ADEA and Title VII rights, I do not intend to express any opinion about its effectiveness in vindicating the rights of securities' customers. Their rights are protected by SEC oversight of the arbitration system in ways that discrimination plaintiffs' are not.[27] While the SEC is charged with protecting customers' rights within the securities industry, the EEOC is not given a similar role with respect to employees' rights.[28] *See e.g.* 15 U.S.C. 678f(b)(5).

## IV. *CONCLUSION*

Having found that Congress intended to preclude enforcement of mandatory, pre-dispute arbitration agreements in Title VII cases, and that the employer's structural dominance of the NYSE arbitration makes it an inadequate forum for the vindication of civil rights claims, I need not reach the issues of whether Rosenberg's waiver of her access to this forum was "knowing and voluntary," *see Prudential Ins. Co. of Am. v. Lai,* 42 F.3d 1299, 1304–05 (9th Cir.1994); *Nelson v. Cyprus Bagdad Copper Corp.,* 119 F.3d 756, 761–62 (9th Cir.1997); *Renteria v. Prudential Ins. Co. of Am.,* 113 F.3d 1104, 1107 (9th Cir.1997); *Kresock v. Bankers Trust Co.,* 21 F.3d 176, 178–79 (7th Cir.1994); *Alamo Rent A Car, Inc. v. Galarza,* 306 N.J.Super. 384, 703 A.2d 961, 963 (N.J.Super.A.D.1997), or whether the U–4 should be unenforceable in this case as an unconscionable contract of adhesion. *See Stirlen v. Supercuts, Inc.,* 51 Cal.App.4th 1519, 60 Cal. Rptr.2d 138, 146 (1997).

**27.** Securities cases, moreover, make up the vast majority of cases arbitrated in this system. In 1991 and 1992, for example, employment cases made up only 28% of the NYSE's arbitral caseload, with discrimination cases making up only 5% of the employment cases. GAO, *Employment Discrimination,* at 7. It is thus perfectly appropriate for the SEC to focus its oversight on customer-dispute cases. *See id.* at 13, 17 (reporting that "SEC focuses its SRO arbitration inspections on customer-firm disputes because of its mandate for Customer protection" and relaying the SEC's statement that "the small number of discrimination cases filed and arbitrated ... does not "warrant any sort of institutional program" for monitoring them."). Bales, *supra,* at 92 (stating that the SEC "exercises virtually no oversight over intra-industry disputes, such as employment discrimination claims.")

The defendants' motion to compel arbitration and for stay of proceedings pending arbitration (docket # 2) is **DENIED.**

**SO ORDERED.**

**28.** In fact, the EEOC has condemned compulsory arbitration for undermining the labor and civil rights protections it is charged with enforcing. Both in its official policies and in its brief submitted to this Court, it has stated that such agreements are inconsistent with the text, purpose, and legislative history of Title VII. *See* EEOC, Notice No. 915.002. I am bound to give "great deference" to the EEOC's views of the proper procedure for vindicating Title VII rights. *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988); *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs,* 401 U.S. at 433–34.