**Myrna PHILLIPS, Plaintiff,**

v.

**CIGNA INVESTMENTS, INC., and Cigna Corporation, Defendants.**

**No. 3:98CV1173 (GLG).**

United States District Court,
D. Connecticut.

Nov. 23, 1998.

Johnathan B. Orleans, Zeldes, Needle & Cooper, Bridgeport, CT, Jeffrey L. Liddle, Allan S. Bloom, Liddle & Robinson, New York City, for Plaintiff.

Kimberly A. Mango, Shipman & Goodwin, LLP, Hartford, CT, for Defendants.

## *OPINION*

GOETTEL, District Judge.

The defendants CIGNA Investments, Inc., and CIGNA Corporation (collectively "CIGNA") have moved this Court, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, to compel arbitration of plaintiff Myrna Phillips' employment discrimination claims based upon CIGNA's internal arbitration policy. The plaintiff has objected to arbitration, claiming that she never agreed to this arbitration policy, which was unilaterally implemented by CIGNA after she had commenced her employment with CIGNA. Alternatively, she asserts that this arbitration policy is unenforceable insofar as it requires all Title

VII claimants to submit their claims to mandatory arbitration, in derogation of their statutory right to litigate their claims in federal court.

In her complaint, the plaintiff has alleged statutory claims for race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"), and the Connecticut Wage Law, C.G.S.A. § 31–71a *et seq.*, and state common-law causes of action for breach of implied contract, quantum meruit, and breach of the covenant of good faith and fair dealing. For purposes of this motion, the specifics of her claims are unimportant. Thus, we include only the facts relevant to the issue of arbitration.

## BACKGROUND FACTS

The plaintiff is an African–American female, who was an employee-at-will with CIGNA Investments, Inc., a subsidiary of CIGNA Corporation, from May, 1995, through January, 1998. The plaintiff's position was Vice President, Fixed Income Research Analyst, in CIGNA's Bloomfield, Connecticut office.

The plaintiff alleges that, beginning in May, 1997, two of her supervisors embarked on a campaign to interfere with and undermine her success and performance as an employee. She protested this treatment to the Human Resources Department but, nevertheless, was placed on a sixty-day timetable to improve her performance. Following this sixty-day period, notwithstanding what the plaintiff describes as her "positive performance," CIGNA presented her with "the Hobson's choice" of being placed on two months' probation or resigning immediately. She was further warned that, if she chose to remain in CIGNA's employ, she would be fired immediately if she was not, based upon CIGNA's unilateral determination, meeting the terms of her probationary period. On November 21, 1997, the plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On January 9, 1998, CIGNA terminated her employment. After receiving a right-to-sue letter from the EEOC, the plaintiff commenced this action.

### CIGNA's Arbitration Policy

During the course of the plaintiff's employment, CIGNA sent out two general distributions to all employees regarding CIGNA's new "Employment Dispute Arbitration Policy." The first memorandum was dated August 3, 1995, and was addressed to "All CIGNA Investment Management Employees." It advised that, effective September 1, 1995, the policy of CIGNA's Investment Management Division will be that any employee with an employment-related disagreement or problem, who is dissatisfied with the results of the internal portion of the Employment Dispute Resolution Program and who wishes to pursue the matter, *must* process the dispute in accordance with the mediation/arbitration policy, which was attached to the memorandum. On September 11, 1996, a second interoffice memo was sent to "All CIM Employees" regarding "Positive Workplace Initiatives." The memorandum mentioned the arbitration policy that had been adopted in 1995 and stated that "an updated copy" of the Arbitration Policy was attached for the employees' information.

The updated arbitration policy provides in relevant part:

### A. STATEMENT OF POLICY

In the interest of fairly and quickly resolving employment-related disagreements and problems, and applying the important public policies expressed in the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, CIGNA Investment Management Division's policy is that arbitration by a neutral third-party is the required and final means for the resolution of any serious disagreements and problems not resolved by the Division's internal dispute resolution processes. Both the Division and the employee will be bound by any decision made by a neutral arbitrator. If the employee or the Division do not abide by the arbitrator's decision, either party may go to court to enforce the arbitrator's decision, but arbitration must be used before going to

court. This policy is intended to prevent an employee from going to court over employment related disputes, it is not intended to take away any other rights.

.    .    .    .    .

This policy is part of the employment relationship between an employee and CIGNA Investment Management Division. It is not, however, a guarantee that employment will continue for any specified period of time or end only under certain conditions.

*Nothing contained in this policy limits in any way an employee's right to resign from employment with any CIGNA company at any time for any reason or any CIGNA company's right to terminate employment at any time for any reason.*

### B. *SCOPE OF THE ARBITRATION PROCEDURE*

This policy covers only serious employment-related disagreements and problems, which are those that concern a right, privilege or interest recognized by applicable law. Such serious disputes include claims, demands or actions under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Equal Pay Act, the Age Discrimination in Employment Act, the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Family and Medical Leave Act, and any other federal, state or local statute, regulation or common law doctrine, regarding employment discrimination, conditions of employment or termination of employment. This policy is intended to substitute final and binding arbitration, which is quick, inexpensive and fair, for going to court, which is slow and expensive.

.    .    .    .    .

This policy does not require that CIGNA Investment Management Division start the arbitration process before taking disciplinary action of any kind, including termi-

nation. This policy does, however, require that an employee who disagrees with any disciplinary action or other adverse employment decision, demand arbitration in accordance with the Division's Arbitration Rules and Procedures rather than go to court, if the matter has not been resolved under the Division's internal dispute resolution process.

(Underlining in original).

CIGNA also states that a copy of the policy was hand-delivered to each employee's individual office, and, on August 8, 1996, the arbitration policy was posted on eleven bulletin boards located in the common areas of the building in which the plaintiff worked. The former Director of CIGNA's Human Resources Department has also testified that he personally discussed the arbitration policy with the plaintiff. The plaintiff concedes that she was aware of this policy. However, she maintains that she never agreed to be bound by it and that she never signed any writing containing the arbitration policy nor did she even acknowledge receipt of it. CIGNA does not dispute the fact that she never agreed in writing to be bound by this policy.

### DISCUSSION

#### *The Federal Arbitration Act*

■    The Federal Arbitration Act ("FAA") provides in relevant part that "[a] written provision in ... a contract evidencing a transaction involving commerce [1] to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a strong federal policy favoring arbitration as an alternative dispute resolution mechanism to the complications of litigation. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Wilko v. Swan,* 346 U.S. 427, 431, 74 S.Ct. 182, 98 L.Ed. 168 (1953); *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 981 (2d Cir.1996). Any doubts regarding the scope of arbitrable is-

---

**1.** The plaintiff does not dispute that her employment involved interstate commerce and, thus, does not challenge the applicability of the FAA on this basis.

sues should be resolved in favor of arbitration. *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. 927.

Section 4 of the FAA directs a federal court to compel arbitration if there has been a "failure, neglect, or refusal" of any party to honor the agreement to arbitrate, 9 U.S.C. § 4, and section 3 provides for a stay of a suit or proceedings where the court is satisfied that the issue before it is "referable to arbitration under an agreement in writing." 9 U.S.C. § 3.

■ In interpreting the FAA, the courts have made clear that "the ancient judicial hostility to arbitration is a thing of the past." *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 200 (2d Cir.1998) (citations omitted). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir.1997) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)) (emphasis in original). However, as the Second Circuit recently noted, despite this strong policy favoring arbitration, one area that has recently engendered greater controversy is the use of mandatory pre-dispute arbitration agreements to resolve statutory claims of employment discrimination. *See Halligan*, 148 F.3d at 201.[2] This increased scrutiny has been spawned by the conflicting national goals of eliminating discrimination in the workplace, on the one hand, and enforcing arbitration agreements, on the other.

*See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F.Supp. 190, 191 (D.Mass.1998). This is the issue with which we are faced in ruling on CIGNA's Motion to Compel Arbitration.

### *Mandatory Arbitration of Statutory Employment Claims*

The courts that have considered the question of the enforceability of mandatory pre-dispute arbitration agreements in the Title VII context have reached conflicting results. *Compare Duffield v. Robertson Stephens & Co.*, 144 F.3d 1182 (9th Cir.1998) (holding that an employer may not require, as a condition to employment, that all employees waive their right to bring Title VII claims in a judicial forum and agree, in advance, to submit their Title VII claims to binding arbitration); *Winkler v. Pacific Brokerage Services, Inc.*, No. 97 C 7340, 1998 WL 341622 (N.D.Ill. June 19, 1998) (same); *Rosenberg, supra* (same); *with Cole v. Burns Int'l Security Services*, 105 F.3d 1465 (D.C.Cir.1997) (upholding an arbitration agreement that required an employee to submit his Title VII claims to arbitration where there were sufficient safeguards to ensure that the arbitration was in a neutral forum); *Mouton v. Metropolitan Life Ins. Co.*, 147 F.3d 453 (5th Cir.1998) (upholding a pre-dispute, mandatory arbitration clause in the Title VII context); *Seus v. John Nuveen & Co.*, 146 F.3d 175, 183 (3d Cir.1998) (disagreeing with *Duffield*); *Austin v. Owens–Brockway Glass Container, Inc.*, 78 F.3d 875 (4th Cir.) (upholding an anticipatory agreement to arbitrate Title VII and ADA claims), *cert. de-*

---

**2.** The Second Circuit in *Halligan* noted the "growing concern" expressed by federal courts over the problem of mandatory arbitration of statutory employment discrimination claims. *See Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1473 (D.C.Cir.1997) (describing arbitration of statutory claims as the "proverbial new kid on the block," with many "detractors," and warning that "blind enforcement of arbitration agreements would undermine Congressional intent as reflected in Title VII"); *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299 (9th Cir.1994) (holding that waivers of a judicial forum for statutory employment discrimination claims must be "knowing and voluntary" and refusing to enforce a signed U–4 securities dealers' agreement to arbitrate that did not meet that standard), *cert.*

*denied*, 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995); *Chisolm v. Kidder, Peabody Asset Management, Inc.*, 966 F.Supp. 218, 225–26 (S.D.N.Y.1997) (noting concerns over mandatory arbitration agreements covering statutory employment claims), *aff'd*, No. 97–7828, 1998 WL 695041 (2d Cir. July 28, 1998) (unpublished disposition); *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 995 F.Supp. 190 (D.Mass. 1998) (holding that an employee could not be compelled to arbitrate her claim given questions as to the voluntary nature of her agreement to arbitrate and the procedural deficiencies in the proposed arbitral forum). The Court in *Halligan*, however, did not address the merits of this issue. 148 F.3d at 203.

*nied,* —— U.S. ——, 117, S.Ct. 432, 136 L.Ed.2d 330 (1996). Neither the Supreme Court[3] nor the Second Circuit has addressed this specific issue.[4]

In analyzing this question, we employ the multi-pronged test enunciated by the Second Circuit in *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 844 (2d Cir. 1987), often referred to as the *"Genesco* test."[5] First, the court must determine whether the parties entered into a valid arbitration agreement. *Id.* 815 F.2d at 845–46. Second, it must determine whether the dispute between the parties falls within the scope of the arbitration clause. *Id.* 815 F.2d at 846–47. Third, if federal statutory claims are asserted, the court must determine whether Congress intended the claims to be nonarbitrable. *Id.* 815 F.2d at 848. Fourth, if the court concludes that some, but not all of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration. *Id.* 815 F.2d at 844.

In the instant case, there is no debate that the claims asserted by the plaintiff fall within the broad parameters of CIGNA's arbitration policy. Therefore, our primary focus is on whether there was an agreement between the parties to arbitrate these claims, and, if so, whether Congress intended plaintiff's statutory claims to be nonarbitrable.[6]

### Was There a Valid and Binding Arbitration Agreement?

The basic objective of the FAA is "not to resolve disputes in the quickest manner possible, no matter what the parties' wishes, ..., but to ensure that commercial arbitration agreements, like other contracts, are enforced according to their terms, ..., and according to the intentions of the parties." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 947, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (citations and internal quotations omitted); *see also Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior Univ.,* 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Thus, the FAA does not require parties to arbitrate when they have not agreed to do so. *Collins & Aikman Products Co. v. Building Systems, Inc.,* 58 F.3d 16, 19 (2d Cir.1995). "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Volt,* 489 U.S. at 479, 109 S.Ct. 1248. While the FAA requires that agreements to arbitrate be in writing, "it does not require that the writing be signed by the parties." *Genesco,* 815 F.2d at 846.

---

3. On November 16, 1998, the Supreme Court decided *Wright v. Universal Maritime Service Corp.,* —— U.S. ——, 119 S.Ct. 391, —— L.Ed.2d —— (1998), which presented the question of whether a general arbitration clause in a collective bargaining agreement requires an employee to use the arbitration procedure for an alleged violation of the Americans with Disabilities Act of 1990 ("ADA"). The Court found it unnecessary to resolve the question of the validity of a union-negotiated waiver, since, based upon the facts presented, the Court found that no such waiver had occurred. The Court held that "a union waiver of employee rights to a federal judicial forum for employment discrimination claims must be clear and unmistakable." *Id.* at n. 2. The Court, however, took no position on whether a pre-dispute agreement in a collective bargaining agreement is enforceable. *Id.*

It is also noteworthy that *Wright* arose under the Labor Management Relations Act, 29 U.S.C. § 129—as opposed to the FAA—which also carries a presumption of arbitrability. The Court specifically declined to consider the applicability of the FAA in *Wright. Id.* at n. 1.

4. *See* Note 2, *supra.* In *Cunliffe v. Sikorsky Aircraft Corp.,* 9 F.Supp.2d 125, 129, n. 2 (D.Conn. 1998) (Arterton, J.), this Court noted its skepticism as to whether Congress had expressly approved of the practice of mandatory arbitration with respect to Title VII claims, but did not reach the merits of the issue. *But see Fahim v. Cigna Investments, Inc.,* No. 3:98CV232(PCD), Slip Op. (D.Conn. Sept. 10, 1998) (Dorsey, J.) (discussed *infra,* upholding CIGNA's pre-dispute mandatory arbitration policy).

5. *See, e.g., Hooters of America, Inc. v. Phillips,* No. 4:96–3360–22, 76 FEP Cases 1757, 1998 WL 317471, at *24 (D.S.C. Mar. 12, 1998).

6. The Fourth Circuit in *Glass v. Kidder Peabody & Co., Inc.,* 114 F.3d 446, 453 (4th Cir.1997), held that the first duty of a district court, in determining whether to grant a motion for arbitration under either section 3 or 4 of the FAA, was to conduct a "substantive arbitrability inquiry" to determine whether a valid arbitration agreement existed between the parties and whether the specific dispute falls within the substantive scope of the agreement.

When deciding whether the parties agreed to arbitrate a certain matter, including the question of arbitrability, we look to state-law principles governing the formation of contracts.[7] *First Options,* 514 U.S. at 944, 115 S.Ct. 1920; *see also Hooters of America, Inc. v. Phillips,* No. 96–3360–22, 76 FEP Cases 1757, 1998 WL 317471, at *25 (D.S.C. Mar. 12, 1998) (holding that even though "arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate," which is governed by state common-law principles of contract law).

### Connecticut Contract Law on At–Will Employment Relations

In the instant case, CIGNA argues that a valid and enforceable contract to arbitrate existed between it and the plaintiff by virtue of plaintiff's continuing her "at-will" employment after she received the arbitration policy from CIGNA. CIGNA states:

> The very nature of their employment at-will relationship meant that CIGNA at all times retained the right to modify the terms of her employment, by changing her rate of pay, working hours, job assignments, or benefits, in any way, absent discriminatory motive. In exchange, if the plaintiff no longer wished to work under changed conditions of employment, she was free to stop working for CIGNA at any time and seek new employment with no further obligation to CIGNA.

Defs.' Reply Mem. at 3. Conversely, the plaintiff argues that there was never a meeting of the minds nor any consideration to support a finding that an agreement to arbitrate existed between the parties.

In *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 662 A.2d 89 (1995), the Connecticut Supreme Court recognized that

> all employer-employee relationships not governed by express contracts involve some type of implied "contract" of employment. "There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working." 1 H. Perritt, Employee Dismissal Law and Practice (3d Ed.1992) § 4.32, p. 326. To determine the contents of any particular implied contract of employment, the factual circumstances of the parties' relationship must be examined in light of legal rules governing unilateral contracts.

*Id.* 234 Conn. at 13, 662 A.2d 89 (emphasis added). In a footnote, the Court defined "unilateral contract" as "one in which the offeror invites acceptance of his promise not by a reciprocal promise, but by performance." *Id.* 234 Conn. 1, 662 A.2d 89 at n. 4. In such a contract, there is no mutuality of obligation between the parties. *Id.* The Court further held that

> [p]ursuant to the legal principles governing such contracts, in order to find that an implied contract of employment incorporates specific representations orally made by the employer or contained in provisions in an employee manual, the trier of fact is required to find the following subordinate facts. Initially, the trier of fact is required to find that the employer's oral representations or issuance of a handbook to the

---

7. The fact that state-law principles control is significant, for the states have taken widely divergent positions on the manner in which a unilateral employment contract may be modified. As discussed by the South Carolina Supreme Court in *Fleming v. Borden, Inc.,* 316 S.C. 452, 450 S.E.2d 589 (1994), the courts have taken three different approaches. Some have held that a subsequent modification to an employment contract may be considered an offer, which the employee accepts by continuing his or her employment with the employer. *Id.,* 450 S.E.2d at 594–95 (citing *Chambers v. Valley Nat'l Bank,* 721 F.Supp. 1128, 1131–32 (D.Ariz.1988)). These courts allow modification of an implied contract in the same manner as the contract was created. A more middle-of-the-road approach requires that, in order for a subsequent modification to be effective, it must be sufficiently communicated to the employee. *Id.* (citing *Preston v. Claridge Hotel & Casino, Ltd.,* 231 N.J.Super. 81, 555 A.2d 12 (1989)). The third approach relies on bilateral contract concepts and requires mutual assent and additional consideration. *Id.* (citing *Toth v. Square D Co.,* 712 F.Supp. 1231 (D.S.C.1989) (holding that an implied contract of employment created by an employee handbook may be modified by a subsequent employee handbook, but to be effective, the employee must have actual notice of the modification), *rejected by Fleming,* 316 S.C. 452, 450 S.E.2d at 595–96).

employee was an "offer"—i.e., that it was a promise to the employee that, if the employee worked for the company, his or her employment would thereafter be governed by those oral or written statements, or both. If the oral representations and/or handbook constitute an "offer," the trier of fact then is required to find that the employee accepted that offer. *Subsequent oral representations or the issuance of subsequent handbooks must be evaluated by the same criteria. To be incorporated into the implied contract of employment, any such representation or handbook must constitute an offer to modify the preexisting terms of employment by substituting a new implied contract for the old. Furthermore, the proposed modifications, like the original offers, must be accepted.* See 1 Restatement (Second), Contracts § 45 and illustration 8 (1981); 2 Restatement (Second), Contracts § 279 (1981); see also 1 E. Farnsworth, Contracts (1990) § 3.24, p. 290.

*Id.* 234 Conn. at 13–14, 662 A.2d 89 (footnote omitted) (emphasis added); *see also Musielski v. Jewish Home for the Elderly,* No. 960330050, 1998 WL 236180, at *3 (Conn.Super. May 4, 1998) (holding that, in order for terms contained in a subsequently issued employee handbook to be incorporated into an existing implied contract of employment, the new terms must constitute an offer to modify the preexisting terms by substituting the new terms for the old, and the proposed modifications must be accepted by the employee). Thus, the Connecticut Supreme Court in *Torosyan* held that a modification to an original employment relationship, whether oral or through a change in an employee handbook, must be accepted by the employee.[8]

To determine whether an employee has accepted the new terms of employment, the *Torosyan* Court held:

> [p]ursuant to the principles of contract law discussed above, for the new manual to have modified the preexisting terms of employment, *the plaintiff must have consented to that modification.* . . . The defendant

argues, however, that the plaintiff consented as a matter of law to the provisions contained in the new manual, because he continued to work for the defendant even after the new manual had been distributed to him. *In the circumstances of this case, we disagree that the mere distribution of the manual and the plaintiff's continued work necessarily demonstrated his consent to the proposed modification of the preexisting contract.*

> . . . .

> *When an employer issues an employment manual that substantially interferes with an employee's legitimate expectations about the terms of employment,* . . . *the employee's continued work after notice of those terms cannot be taken as conclusive evidence of the employee's consent to those terms.* . . . The fact that an employee continues working, therefore, may be relevant to determining whether he or she consented to the new contract, but cannot itself mandate a finding of consent.

234 Conn. at 17–19, 662 A.2d 89 (citations omitted) (emphasis added). In *Torosyan,* the Court found that the plaintiff had a "legitimate expectation" that his employment would be terminated only for cause, and that he did not accept a change in the employment manual which deleted the "for cause" requirement merely by his continued employment. *Id.* In a footnote, however, the Court noted that it was not deciding the issue of whether an employee, who had notice of new terms in an employment manual that changed rights afforded to the employee but did not materially interfere with that employee's legitimate expectations about the terms of his or her employment, and who continued to work thereafter, accepted those terms as a matter of law. *Id.* 234 Conn. 1, 662 A.2d 89 at n. 7.

### Connecticut Caselaw on Mandatory Pre-Dispute Arbitration Agreements

Since *Torosyan,* there have been three decisions in Connecticut that have ruled on the precise issue presented here. Indeed, all three cases have involved the same CIGNA

---

8.  We expressly reject CIGNA's narrow and limited reading of *Torosyan, see* Defs.' Reply Memo.

at 4, which would limit the Connecticut Supreme Court's holding to *Torosyan's* "unique facts."

policy. In *Gibbs v. Connecticut General Life Ins. Co.*, No. CV97 0567009, 1998 WL 123010, (Conn.Super. Mar. 3, 1998), in what the court characterized as a case of "first impression," a Connecticut Superior Court ruled on the binding effect of this same CIGNA arbitration clause in circumstances nearly identical to those presented herein and held that "[b]ecause there was no meeting of the minds, and the agreement was not supported by consideration, no agreement to arbitrate was formed under Connecticut law." *Id.* at *4. Relying on *Torosyan*, the *Gibbs* court reiterated that "proposed modifications, like the original offers, must be accepted." *Id.* at *5 (internal quotations and citations omitted). The plaintiff's continued employment, even after notice of additional terms, "is not sufficient consideration to support a contract or modification to a contract, if the employer does not provide any additional benefit to the employee." [9] *Id.*

The *Gibbs* decision was followed in *Wood v. Connecticut General Life Ins. Co.*, No. CV 9866592S, 1998 WL 774161 (Conn.Super. Oct. 28, 1998). *Wood* held that the plaintiff's continued employment did not constitute an acceptance of the employer's new arbitration policy, which was distributed twelve years after she commenced her employment and which "substantially interfered with the plaintiff's legitimate expectations concerning the terms of her employment." *Id.* at *3.

A contrary result, however, was reached by Judge Dorsey of this Court in *Fahim v. Cigna Investments, Inc.*, No. 3:98CV232(PCD), Slip Op. (D.Conn. Sept. 10, 1998), which also involved this same arbitration clause. In *Fahim*, Judge Dorsey rejected the reasoning of *Gibbs* and held that plaintiff's "continued employment [as an at-will employee] itself is enough consideration for the new contract of employment which is subject to the added terms." *Id.* at 6. Judge Dorsey distinguished *Torosyan* on the

ground that the plaintiff in that case had a contractual right to be discharged only for cause and, thus, the employer had no unilateral right to change the contract to one of an employment-at-will. *Fahim*, Slip Op. at 5. He further held that a plaintiff's right to sue in court for employment discrimination was not a "legitimate expectation" and then went on to decide the issue left open by *Torosyan* —*i.e.* that the employee's continued employment constituted an acceptance of this change.

After a thorough analysis of relevant caselaw, we agree with the holdings in *Gibbs* and *Wood*, and respectfully disagree with the result reached in *Fahim*. Our holding in this regard is based in large measure upon our reading of the Connecticut Supreme Court's decision in *Torosyan*, discussed above. The plaintiff in this case, like the plaintiff in *Torosyan*, had an implied unilateral contract with her employer (albeit not one under which she could only be terminated for cause), which she accepted when she commenced her employment. *See Torosyan*, 234 Conn. at 13, 662 A.2d 89.

In the instant case, it is undisputed that the plaintiff never expressly accepted CIGNA's arbitration policy, either by signing the new policy statement or verbally agreeing to be bound by it. Thus, we are faced with the question of whether her continued employment, with knowledge of the policy, constituted an acceptance of this modification of her employment relationship under the principles set forth in *Torosyan*. Whether the plaintiff's continued employment with CIGNA was sufficient to constitute an acceptance of this change in policy depends in large measure on whether the plaintiff had a "legitimate expectation" that she could litigate her Title VII and other statutory employment claims in federal court.

---

**9.** *Gibbs* denounced the reasoning of *Durkin v. CIGNA Property & Cas. Corp.*, 942 F.Supp. 481, 488 (D.Kan.1996), *Porter v. CIGNA*, No. 1:96–CV–765–MHS, Slip Op. (N.D.Ga. Mar, 25, 1997), and *Toone v. Montgomery*, No. 96–1109–III, Slip Op. (Ch.Ct., Davidson Cty, N.C., Mar. 11, 1997), which held that the same CIGNA arbitration policy was part of the employment relationship because the language of the policy indicated that

a contractual duty was created. The court in *Gibbs* correctly held that one party's merely saying that an arbitration policy is part of the employment relationship does not make it so. 1998 WL 123010, at *12. Thus, the court in *Gibbs* rejected the holding of *Durkin* that an employee's continued employment under these circumstances is sufficient consideration.

As discussed below, based upon the express statutory language of Title VII that allows an aggrieved person to bring a civil action in federal court, as well as the legislative history of the 1991 Civil Rights Act, amending Title VII, and Supreme Court precedent, we find this was a "legitimate expectation." [10] The new arbitration policy "materially interfered" with this expectation by eliminating this right entirely. Therefore, we find that plaintiff's continued employment, without more, was insufficient to constitute an acceptance of this new policy. *See Torosyan*, 234 Conn. at 19 & n. 7, 662 A.2d 89.

### Did Plaintiff have a "Legitimate Expectation" of Bringing Her Statutory Employment Claims in Federal Court?

We begin with the proposition that Title VII gives a person aggrieved by an alleged unlawful employment practice the statutory right to file a civil action after exhausting administrative remedies. 42 U.S.C. § 2000e-5(f)(1). As amended by the Civil Rights Act of 1991, § 102, 105 Stat. 1072, 42 U.S.C. § 1981a, Title VII now provides for a right to trial by jury if the aggrieved party is seeking compensatory or punitive damages. 42 U.S.C. § 1981a(c)(1). It would seem that this statutory right alone would be sufficient to create a "legitimate expectation" on the part of the plaintiff as to her right to file her discrimination suit in federal court, which under Connecticut law could not be abridged unilaterally by the defendant. However, in light of a number of federal cases upholding mandatory arbitration of statutory claims—including employment discrimination claims—further analysis of this issue is warranted.

The evolution of the law on mandatory arbitration of statutory employment discrimination claims is discussed at length in an excellent opinion by Judge Gertner in *Rosen-*

berg v. Merrill Lynch, supra. As *Rosenberg* points out, for nearly twenty years, it was beyond question that victims of workplace discrimination were entitled to litigate their claims in a judicial forum regardless of any pre-dispute arbitration agreement. *Id.*, 995 F.Supp. at 194; *see also Prudential Ins. Co. v. Lai*, 42 F.3d 1299, 1303 (9th Cir.1994) (collecting cases).

### Supreme Court Precedent

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court held that an employee's statutory right to trial *de novo* under Title VII could not be foreclosed by the prior submission of his claim to final arbitration under a nondiscrimination clause in a collective bargaining agreement. The Court stated, "we think it clear that there can be no prospective waiver of an employee's rights under Title VII." *Id.* 415 U.S. at 51, 94 S.Ct. 1011. Because Title VII concerns an individual's rights to equal employment opportunity, the Court held that "an employee's rights under Title VII are not susceptible of prospective waiver." *Id.* 415 U.S. at 51–52, 94 S.Ct. 1011. "The purpose and procedures of Title VII indicate that Congress intended federal courts to exercise final responsibility for enforcement of Title VII; deferral to arbitral decisions would be inconsistent with that goal." *Id.* 415 U.S. at 56, 94 S.Ct. 1011. Rejecting the argument that arbitral processes are commensurate with judicial processes, the Court found that arbitral procedures, "while well suited to the resolution of contractual disputes, make arbitration a comparatively inappropriate forum for the final resolution of rights created by Title VII." *Id.* See generally *Duffield*, 144 F.3d at 1188 (noting that, prior to 1991, *Gardner–Denver* was widely interpreted as prohibiting any form of compulsory arbitration of Title VII claims).[11]

---

**10.** The Connecticut Superior Court has recently held that a plaintiff had a "legitimate expectation" that her right to take legal action under Connecticut's Fair Employment Practices Act for sexual harassment was a "legitimate expectation" that could not be restricted. *Norton v. Commercial Credit Corp.*, CV 98–057441–S, 1998 WL 729700, at *2 (Conn.Super. Oct. 8, 1998).

**11.** This Court has recently applied *Gardner–Denver* to hold that a plaintiff alleging disability discrimination under the Americans with Disabilities Act ("ADA") was not required to pursue arbitration under a collective bargaining agreement prior to bringing her suit in federal court. *Knight v. Southern New England Telephone Co.*, No. 3:97CV1159(WWE), 1998 WL 696014 (D.Conn. Sept. 18, 1998). *See also Zarzycki v. Hamilton Standard*, No. 3:96CV1782(GLG), 1997

In subsequent cases, the Supreme Court reaffirmed that Title VII has always looked to the federal courts for enforcement. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (stating that the federal courts were entrusted with the ultimate enforcement responsibility under Title VII); *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 64, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (stating that the ultimate authority to secure compliance with Title VII resides in the federal courts).

In the mid– to late–1980's, however, the arbitration landscape was materially altered when the Supreme Court handed down a trilogy of decisions that reversed the long-standing presumption against enforcement of pre-dispute agreements to arbitrate statutory claims. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). These cases emphasized the strong federal policy favoring arbitration and held that "[b]y agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi*, 473 U.S. at 628, 105 S.Ct. 3346. The Supreme Court recognized an exception to this general rule upholding arbitration agreements where, from the text or legislative history of the statute, it could be deduced that "Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* It is noteworthy that these three cases involved commercial, business transactions, and all three shared a presumption that the plaintiffs ·had freely entered into the agreement to arbitrate. Thus, the context in which these cases arose was very different than the situation presented in the instant case and in most civil rights cases. *See Rosenberg*, 995 F.Supp. at 196 (discussing the inequality in bargaining power between employees and their employers and the fact that the discrimination laws reflect the Congressional findings that these groups are in need of federal protection in the workplace).

In 1991, the Supreme Court decided *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), which held that an Age Discrimination in Employment Act ("ADEA") claim was subject to compulsory arbitration [12] pursuant to an arbitration agreement in a securities registration application.[13] *Gilmer* distin-

---

WL 380434 (D.Conn. June 12, 1997) (holding that plaintiff's ADA claims were not governed by arbitration provision in collective bargaining agreement). In *Zarzycki*, this Court expressly stated, however, that it was not addressing the more difficult issue of whether an arbitration agreement in a collective bargaining agreement may ever preclude an individual employee from pursuing statutory discrimination claims in federal court. 1997 WL 380434, at *3, n. 1.

12. The Supreme Court held that an individual ADEA claimant subject to a mandatory arbitration agreement would still be free to file a charge of discrimination with the EEOC, even though he or she is not able to institute a private judicial action. *Gilmer*, 500 U.S. at 28, 111 S.Ct. 1647. Additionally, the Court noted that an arbitration agreement would not preclude the EEOC from bringing actions seeking class-wide and equitable relief. *Id.* 500 U.S. at 31, 111 S.Ct. 1647; *see also Equal Employment Opportunity Commission v. Kidder, Peabody & Co., Inc.*, 156 F.3d 298 (2d Cir.1998) (holding that a binding arbitration agreement between an employer and employee did not preclude the EEOC from seeking injunc-

tive· relief in an ADEA case, although it did preclude the EEOC from seeking monetary relief).

13. This arbitration agreement was contained in the U–4 form (Uniform Application for Securities Registration or Transfer) that many employees in the securities industry must sign upon commencing their employment. It is interesting to note that, on October 17, 1997, the National Association of Securities Dealers, Inc., submitted to the Securities and Exchange Commission a proposed rule change to remove the mandatory arbitration requirement from its rules that registered representatives must arbitrate statutory employment discrimination claims. Securities Exchange Act Release No. 39421, 62 Fed.Reg. 66164 (Dec. 17, 1997). The SEC has indicated its approval of this change and has recently published a Notice of Proposed Rule Changes, which would amend the U–4 form to no longer require mandatory arbitration of statutory discrimination complaints unless the parties agreed to arbitrate the dispute *after* the claim arose. SEC Notice of Filing of Proposed Rule Changes by the New

guished *Gardner–Denver*, and its progeny, *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981),[14] and *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984),[15] on three grounds. First, the Court held that those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue of whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Second, the Court held that arbitration in those cases occurred in the context of a collective bargaining agreement, where the claimants were represented by their unions, thus raising a concern about the tension between collective representation and individual statutory rights. Third, the Court noted that those cases were not decided under the FAA. 500 U.S. at 35, 111 S.Ct. 1647. Significantly, however, in distinguishing *Gardner–Denver*, *Gilmer* did not address the differences or similarities between the ADEA and Title VII.

The "obvious[ ] . . . tension" between these two lines of cases was recently recognized—but not resolved—by the Supreme Court in *Wright v. Universal Maritime Service Corp.*, — U.S. ——, 119 S.Ct. 391, — L.Ed.2d —— (1998). The Court held that, although an employee's statutory right to a judicial forum for claims of employment discrimination is not a substantive right, "*Gardner–Denver* at least stands for the proposition that the right to a federal judicial forum is of sufficient importance to be protected against less-than-explicit union waiver in a [collective bargaining agreement]." The Court, however, declined to decide the issue of "whether or not *Gardner–Denver's* seemingly absolute prohibition of union waiver of employees' federal forum rights survives *Gilmer*."

### The 1991 Civil Rights Act

The same year that *Gilmer* was decided, Congress passed the 1991 Civil Rights Act, which increased the remedies available under Title VII and amended the substantive and procedural provisions of Title VII to make enforcement of the Act more effective. *See Rosenberg*, 995 F.Supp. at 200; *see also Duffield*, 144 F.3d at 1191. "In the context of the Act's significant enlargement of the substantive and procedural rights of victims of employment discrimination, Congress also included what Chief Judge Posner has termed 'a polite bow to the popularity of alternate dispute resolution.'" *Duffield*, 144 F.3d at 1191 (citing *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 363 (7th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997)). Section 118 of the 1991 Civil Rights Act addresses directly the issue of the arbitrability of Title VII claims and states: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, fact-finding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this Title." Pub.L. 102–166, § 118, *reprinted in* Notes to 42 U.S.C. § 1981 and cited in Notes to 42 U.S.C. § 1981a, 105 Stat. 1071, 1081 (1991).[16]

York Stock Exchange, Inc. Relating to Arbitration Rules, amending Rules 347 and 600, 63 Fed.Reg. 52782 (Sept. 24, 1998).

**14.** *Barrentine* applied *Gardner–Denver* to a claim under the Fair Labor Standards Act ("FLSA"). The Court held that the petitioners were not required to submit their federal claims to arbitration despite the inclusion of a mandatory arbitration clause in their collective bargaining agreement, emphasizing that the FLSA like Title VII is designed to protect individual workers and ensure that every worker receives a fair wage.

**15.** *McDonald* held that, in an action under 42 U.S.C. § 1983, a federal court should not afford preclusive effect to an unappealed arbitration award under a collective-bargaining agreement, and, therefore, the plaintiff's section 1983 claim

was not barred by the arbitration award. The Court noted that its decision, as well as its prior decisions in *Gardner–Denver* and *Barrentine*, was based "in large part on [its] conclusion that Congress intended the statutes at issue in those cases to be judicially enforceable and that arbitration could not provide an adequate substitute for judicial proceedings in adjudicating claims under those statutes." 466 U.S. at 289, 104 S.Ct. 1799.

**16.** The Americans with Disabilities Act ("ADA") contains an almost identical provision. Section 12212 of the ADA, passed in 1990, tracks this same language. 42 U.S.C. § 12212. The legislative history indicates that Congress intended to codify in the ADA the protections of the Supreme

This Court has previously considered the implications of section 118 in the context of a section 1981 claim and concluded that "Congress has expressly encouraged alternative methods of dispute resolution, including arbitration, in resolving § 1981 claims." *Almonte v. Coca–Cola Bottling Co. of New York, Inc.*, 959 F.Supp. 569, 574 (D.Conn. 1997). Based upon this Congressional expression of approval, this Court in *Almonte* upheld an arbitration clause in a collective bargaining agreement.

Without question, Congress has indicated its approval of various forms of alternative dispute resolution in civil rights cases. However, this was not an absolute expression of approval nor an endorsement of mandatory, pre-dispute arbitration agreements, for Congress added two qualifiers in section 118: "where appropriate" and "to the extent authorized by law." As the court in *Rosenberg* noted, the question then is whether these qualifiers referred to the bar on pre-dispute arbitration agreements as set forth in *Gardner–Denver* and its progeny, or whether it referred to the acceptance of such agreements in *Gilmer,* not yet decided at the time of the House Reports but "perhaps presaged by other Supreme Court cases outside the civil rights field." 995 F.Supp. at 201.

The historical backdrop for the adoption of section 118 sheds light on the meaning of the terminology employed. *See Martens v. Smith Barney, Inc.,* 181 F.R.D. 243 (S.D.N.Y.1998); *Rosenberg,* 995 F.Supp. at 203. Although the 1991 Civil Rights Act was enacted after the Supreme Court's decision in *Gilmer,* section 118 was drafted prior thereto. The first version of what was to become the 1991 Civil Rights Act was introduced in February of 1990 and was passed by both the House and Senate, but was vetoed by President Bush. H.R.Rep. No. 102–40(II), at 53 (1991), *reprinted in* 1991 U .S.C.C.A.N. 738–39. The final drafts of the 1991 bill were reported out of the House Labor and Judiciary Committees in March of 1991, several months before the decision in *Gilmer,* decided May 13, 1991. Because section 118 predated *Gilmer,* presumably Congress used the phrase "where appropriate and to the extent authorized by law" to reference the limitations on arbitration discussed in *Gardner–Denver.* The House Committee Report, in referring to section 118, emphasized that

the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section to be used to preclude rights and remedies that would otherwise be available.

H.R.Rep. No. 102–40(I), at 97, *reprinted in* 1991 U.S.C.C.A.N. 549, 635. Additionally, Congress rejected an amendment to the Civil Rights Act of 1991 under which "employers could refuse to hire workers unless they signed a binding statement waiving all rights to file Title VII complaints." *Id.* Indeed, in the Statement of President George Bush upon signing the Civil Rights Act of 1991, the President stated that section 118 "encourages *voluntary* agreements between employers and employees to rely on alternative mechanisms such as mediation and arbitration." 1991 U.S.C.C.A.N. 768 (Nov. 21, 1991) (emphasis added).

Thus, from the legislative history it appears that Congress, in enacting the 1991 Civil Rights Act, endorsed voluntary alternative dispute resolution but never intended arbitration or other alternative dispute resolution mechanisms to be used as a vehicle for denying Title VII claimants their day in court. *Martens,* 181 F.R.D. at 258. As the Ninth Circuit stated in *Duffield,* "the legislative history of the Act makes it absolutely clear that Congress intended § 118 to codify the *Gardner–Denver* approach to compulsory arbitration agreements and to preclude the

Court decision in *Gardner–Denver. See Duffield,* 144 F.3d at 1192, n. 10.

enforceability of such agreements with respect to Title VII claims." 144 F.3d at 1198.

The courts have also looked at Congress' directive in the legislative history that Title VII should be read broadly so as to best effectuate its remedial purposes. *See, e.g., id.* 144 F.3d at 1192. "The purpose of the 1991 Act was uniformly to expand employee's rights and 'to increase the possible remedies available to civil rights plaintiffs.'" *Id.* (quoting *Prudential Ins. Co. v. Lai,* 42 F.3d at 1304). As the court in *Duffield* stated:

> It, thus, would be at least a mild paradox to conclude that in the very Act of which the primary purpose was to strengthen existing protections and remedies available to employees under Title VII, Congress encouraged the use of a process whereby employers condition employment on their prospective employees' surrendering their rights to a judicial forum for the resolution of all future claims of race or sex discrimination and force those employees to submit all such claims to compulsory arbitration. It seems more plausible that Congress meant to encourage *voluntary* agreements to arbitrate—agreements such as those that employers and employees enter into after a dispute has arisen because *both* parties consider arbitration to be a more satisfactory or expeditious method of resolving the disagreement.

*Duffield,* 144 F.3d at 1192–93 (quoting *Pryner,* 109 F.3d at 363 and H.R.Rep. No. 40(II) at 1) (emphasis in original) (internal quotations and citations omitted).

### EEOC Policy Statement on Mandatory Arbitration

The EEOC, which is charged with the interpretation and enforcement of the federal employment discrimination laws, has adopted a similar position in a Notice No. 915.002, dated July 10, 1997. In this Policy Statement on Mandatory Arbitration, the EEOC takes the position that agreements that mandate binding arbitration of discrimination claims as a condition of employment are contrary to the fundamental principles evinced in these laws. EEOC Notice No. 915.002 ¶ 7. The EEOC noted the increasing frequency with which employers are requiring appli-

cants and employees to give up their rights to pursue employment discrimination claims in court and to agree to resolve disputed claims through binding arbitration. After discussing the history of the civil rights legislation and the role that the federal courts play in the overall enforcement scheme, the EEOC stated that "[t]he private right of access to the judicial forum to adjudicate claims is an essential part of the statutory enforcement scheme.... The courts cannot fulfill their enforcement role if individuals do not have access to the judicial forum." *Id.* ¶ D. Citing *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 418, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the EEOC stated that, by bringing a claim in court, a civil rights plaintiff serves not only his or her private interests, but also serves as "the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority." *Id.* (internal citations and quotations omitted). Based upon these general principles, the EEOC opposed the "privatization" of enforcement of federal discrimination laws through private arbitrators.

Additionally, the EEOC challenged the limitations of the arbitral process, arguing that even the fairest of arbitrations is private in nature and thus allows for little public accountability. Also, arbitration, by its very nature, does not allow for the development of the law, and adversely affects the EEOC's ability to enforce the Civil Rights Laws. Accordingly, the EEOC stated that it would continue to process charges regardless of whether the charging party had agreed to arbitrate employment disputes. *Id.*

### Plaintiff's "Legitimate Expectation" of a Federal Forum for her Statutory Employment Claims and Her Lack of Acceptance of CIGNA's Unilateral Policy Change

Based upon our review of Supreme Court precedent, Title VII's statutory provisions and the legislative history of the 1991 amendments, as well as the EEOC's Policy Statement, we hold that the plaintiff had a "legitimate expectation" that she would be able to enforce her rights under Title VII in federal court. Under *Torosyan,* the mere continuation of plaintiff's employment does not constitute an acceptance of this new arbitration

policy, which modified her implied, at-will employment contract with CIGNA. Rather, the plaintiff's continuation of her employment was merely the performance of duties under her original contract. *See Norton, supra,* 1998 WL 729700 (holding that there was no additional consideration to support plaintiff's signing forms, two weeks after she commenced her employment, that contained an arbitration policy that would have required plaintiff to arbitrate her sexual harassment claims). Indeed, it is somewhat illogical to assume that the plaintiff's continuation of her employment was a knowing acceptance of a unilaterally promulgated policy by her employer, affecting her right to litigate statutory discrimination claims—a right which the plaintiff at the time presumably had no idea she would ever have need to invoke. *See generally* 1 Henry H. Perritt, Jr., *Employee Dismissal Law and Practice* § 6.48 (4th ed.1998). Under Connecticut law, more is required to constitute an acceptance of this policy change, which materially interfered with plaintiff's legitimate expectations of a federal forum.

Having found that the parties never entered into a valid agreement to arbitrate, we save for another day the question of whether Congress intended to preclude all mandatory pre-dispute arbitration agreements of Title VII claims or whether there can ever be a valid pre-dispute waiver of Title VII rights, even if voluntary. In this case, based upon state-law principles which govern our determination, there was no valid and binding arbitration agreement between the parties.

### CONCLUSION

CIGNA premised its motion to compel arbitration and to stay judicial proceedings on the fact that the plaintiff "entered into a valid agreement to arbitrate with her employer." Defs.' Motion to Compel, at 1. We disagree. There is no evidence in the record that would support a finding that the plaintiff entered into an agreement to arbitrate. Clearly, she did not expressly agree to this policy, and, based upon the Connecticut Supreme Court's holding in *Torosyan,* we find, for the reasons discussed above, that the mere continuation of her employment was

not sufficient to constitute an acceptance of this new policy. Accordingly, we hold that the arbitration policy is not enforceable under the FAA as to the plaintiff's claims of employment discrimination and, therefore, we **DENY** CIGNA's Motion to Compel Arbitration [**Doc. # 5**].

**SO ORDERED.**